**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALBERT CUNNINGHAM,
*Petitioner-Appellant*,

v.

ROBERT K. WONG,
*Respondent-Appellee*.

No. 09-99008

D.C. No.
2:02-CV-07170-
GHK

OPINION

Appeal from the United States District Court
for the Central District of California
George H. King, District Judge, Presiding

Argued and Submitted
March 8, 2012—Pasadena, California

Filed January 8, 2013

Before: Harry Pregerson, Ronald M. Gould,
and Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman;
Partial Concurrence and Partial Dissent by Judge Pregerson

# SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence for robbery/murder.

The panel first held that the state court's rejection of petitioner Cunningham's prosecutorial misconduct claims was not unreasonable. The panel explained that the prosecutor did not violate *Brady* by suppressing either the victim's medical records or his autopsy report because Cunningham's attorneys possessed the salient facts that would have allowed them to access this easily attainable evidence. The panel held that Cunningham procedurally defaulted on his claim that the prosecutor improperly suggested to the jury that Cunningham had changed his appearance for trial.

The panel next affirmed the denial of relief as to all of Cunningham's claims of ineffective assistance of counsel. Cunningham claimed that his attorneys should have investigated medical records that apparently contradicted the second victim's account of how his shooting injury occurred, but the panel held that the evidence was cumulative of other evidence and argument presented at trial that pointed out the discrepancy. Cunningham also claimed that counsel should have investigated an autopsy report documenting the discovery of cash on the victim after the shooting, but the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel observed that other evidence still supported the robbery conviction. Cunningham claimed that counsel should have presented alibi evidence, but the panel observed that such evidence was weak and consistent with Cunningham's guilt. Cunningham claimed that counsel should have objected to the prosecutor's comments denigrating the defense team during closing argument, but the panel held that there was no reasonable likelihood that the outcome would have been different had counsel objected. Cunningham claimed that counsel should have objected to the prosecutor's comments on his changed appearance, but the panel held that it was an acceptable defense strategy to withhold objections to an opponent's opening statement, and Cunningham was not prejudiced by counsel's performance. Finally, Cunningham claimed that counsel did not adequately investigate and present further mitigating evidence at the penalty phase, but the panel held that he was not prejudiced when the testimony was cumulative and might have opened the door to aggravating evidence.

The panel also held that the state court did not unreasonably apply clearly established federal law or unreasonably determine the facts when it found no *Miranda* violation, and that any error in admitting Cunningham's statement into evidence was harmless because he did not actually confess.

Finally, the panel held that Cunningham's claims did not result in cumulative error requiring reversal.

Judge Pregerson concurred in part and dissented in part. He would grant habeas relief as to Cunningham's claim of ineffective assistance in failing to call an expert witness at the penalty phase.

**COUNSEL**

Jerry L. Newton, Carmel, California; Norman D. James, Corvallis, Montana, for Petitioner-Appellant.

Edmund G. Brown Jr., Attorney General of California; Dane R. Gillette, Chief Assistant Attorney General; Pamela C. Hamanaka, Senior Assistant Attorney General; A. Scott Hayward and Lance E. Winters, Deputy Attorneys General, Los Angeles, California, for Respondent-Appellee.

**OPINION**

TALLMAN, Circuit Judge:

Petitioner-Appellant Albert Cunningham ("Cunningham") appeals the district court's denial of his petition for a writ of habeas corpus. 28 U.S.C. § 2254. Cunningham was convicted of robbery/murder in California state court and was sentenced to death in 1988. He raises ten individual claims alleging error in both the guilt and penalty phases of his California criminal proceedings. His claims generally fall into three categories: 1) prosecutorial misconduct; 2) ineffective assistance of counsel; and 3) improper admission of post-arrest statements. We have jurisdiction under 28 U.S.C. § 2253, and we affirm.

**I**

**A**

At about 9:00 p.m. on December 1, 1985, Carmen Treto ("Treto"), the murder victim, drove his white-over-black

Buick LeSabre to the Pair of Aces Bar in Pasadena, California. Treto had just received $1,400 or $1,500 in cash for a job, and he carried the money in various places on his person. Juvenal Gallegos, the bar's doorman, and Angel Gallegos, the manager, both saw Treto at the bar that night, recognizing that he was very drunk.

At about 11:00 p.m., Juan Cebreros ("Cebreros"), another victim and the surviving eyewitness to the murder, arrived at the Pair of Aces with his brother, Favio. Cebreros and Treto played pool together.

Between 7:00 p.m. and 2:00 a.m., both Angel and Juvenal Gallegos, as well as Cebreros, saw Cunningham at the bar. They described Cunningham as an African-American male in his forties, slender and about 5 feet 10 inches tall. The witnesses said Cunningham was wearing a maroon three-piece pinstripe suit and tie as well as thick glasses with dark rims. He had a mustache and goatee, and his hair was shoulder-length. He also had a distinctive gold front tooth.

Around 1:30 a.m., Cunningham left the Pair of Aces and entered Rickey's Lounge, another nearby bar. Witnesses at Rickey's recognized Cunningham as also having been there earlier that evening. Cunningham started playing pool at Rickey's with the boyfriend of the bartender, who noticed that Cunningham kept his left hand close to his body and folded his arms to keep his coat from opening, as if to conceal something. After about half an hour, Cunningham visited the restroom and remained inside until the bartender announced the bar was closing. He then left the restroom and the bar.

Cebreros left the Pair of Aces for home about the same time, just before 2:00 a.m. Although other patrons urged

Treto to go home and sober up, he was apparently the last person to leave. As Treto finally staggered out of the bar, Juvenal Gallegos saw about $400 in $100 and $50 bills sticking out of Treto's shirt pocket.

A short time later, Cebreros, worried for Treto's safety, returned to the Pair of Aces in his own vehicle to offer Treto a ride home. Treto was standing by a lamppost in front of the bar when Cebreros drove up. Cebreros parked in the lot behind the bar, then walked to the front of the bar to speak with Treto. Despite his obvious intoxication, Treto insisted on driving he and Cebreros to Treto's residence in Treto's Buick. Treto had reached the driver's side door and had bent down to insert the key when a man later identified as Cunningham approached from the direction of Rickey's Lounge.

Cebreros, who was standing next to Treto, heard Cunningham demand, "Hey amigo, give me the money." He saw Cunningham point a gun at Treto as he declared, "This is a .357 magnum." Treto turned to face Cunningham and extended his hands. Without warning, Cunningham suddenly fired, hitting Treto in the chest. Cebreros turned and ran but was shot in the thigh as he fled. Despite his bullet wound, Cebreros managed to reach a nearby fast-food restaurant where he had someone call the police.

Shortly after the robbery occurred, two different officers working in the neighborhood saw an African-American man with long hair and glasses driving eastbound from the scene in a white-and-black car with its headlights off. One of these officers, Pasadena Police Officer Hal Edwards, was dispatched to the scene of the shooting. On arrival, he found Treto lying on his back in a pool of blood. One of Treto's

shoes had been removed and a small amount of cash remained on the ground. His car was also missing.

Another first responder, Officer John Thomas, was instructed to collect evidence and photograph the scene. He found some bills and coins on the ground and eight $1 bills in Treto's pants pocket, but he testified that Treto's wallet, shoes, shirt, and jacket were all empty.

Officers Carter and Ortiz arrived on the scene. Cebreros spoke with Ortiz in Spanish. Pasadena firemen, including Paramedic Sean English, treated Cebreros at the scene before he was taken to Huntington Memorial Hospital. While at the hospital, Cebreros described his assailant to Detective Lee Baroni as having a brown suit, glasses, and a beard.

Treto died at the hospital from uncontrolled bleeding and cardiac arrest. A bullet was recovered from his spine on autopsy, and a forensic examination revealed that it was capable of being fired from either a .38 special or .357 magnum revolver.

Approximately forty-two hours after the robbery/murder, Treto's car was discovered in Compton. The car had been stripped and abandoned and contained no usable prints other than those of Treto's wife. It had rained between the shooting and the discovery of the car.

On December 13, 1985, Cunningham returned to patronize the Pair of Aces. Angel and Juvenal Gallegos immediately recognized Cunningham as having been present the night of the murder and called the police. Officer Delgado arrived, arrested Cunningham, and took him to the

Pasadena Police Station. Cebreros identified Cunningham as the murderer from a photographic lineup.

## B

After Cunningham's arrest on December 13, 1985, the Los Angeles County District Attorney filed a felony complaint charging him with (1) murder of Treto during the course of a robbery; (2) robbery of Treto; (3) attempted murder of Cebreros by infliction of great bodily injury; (4) attempted robbery of Cebreros; and (5) possession of a firearm by a felon. Cunningham was arraigned in February 1986 and pleaded not guilty to all charges. In November 1986, before trial in the murder case, the District Attorney filed a separate complaint against Cunningham for forcibly sodomizing a fellow inmate in the Los Angeles County Jail.

The guilt phase of Cunningham's trial began on July 27, 1988. The trial was held before Los Angeles County Superior Court Judge Gilbert Alston. Cunningham was represented by appointed counsel, Michael Udovic ("Udovic") and Terrence Bennett ("Bennett"). Assistant District Attorney Susan Wondries ("Wondries") handled the prosecution. On August 17, 1988, the jury convicted Cunningham on all counts.

In a separate proceeding from August 22–23, the jury found as true that Cunningham had two prior felony convictions. One of the felonies was Cunningham's prior conviction for second-degree murder for the killing of Ella Mae Fellows in 1976. The other felony was Cunningham's assault with a deadly weapon on a police officer, a crime discussed at length later in the penalty phase of the trial.

**C**

The penalty phase of Cunningham's trial began on August 24, 1988. The defense chose to present its case in mitigation first. The mitigating evidence demonstrated (1) Cunningham's terrible childhood; (2) family love for Cunningham despite his misdeeds; (3) Cunningham's previous positive adjustment to prison life; and (4) Cunningham's version of his prior crimes, including the murder of Ella Mae Fellows, his shootout with police officers following his theft of a taxi cab, and the most recent allegation of forced sodomy. The defense called as witnesses (1) Cunningham's mother, Rosa Vaughn; (2) Johnnie Washington, a pastor at Cunningham's church and former boarder at Rosa Vaughn's home; (3) Marilyn Cox, an employee of Volt Temporary Services, Cunningham's employer; and (4) Cunningham himself.

Rosa Vaughn testified as to Cunningham's difficult personal history. She told the jury that Cunningham's father, Albert Sr., beat her while she was pregnant and caused her to fall on her stomach. She also mentioned that Cunningham suffered a "forceps delivery" at birth, causing holes in his head that took months to heal. Rosa Vaughn left Cunningham's father when Cunningham was still an infant, isolating the child from any positive male role models.

Cunningham showed intellectual promise in his early years, moving up a grade in elementary school. But he experienced ongoing psychological problems that plagued him for the rest of his life; problems for which Rosa Vaughn sought advice from neurologists, psychiatrists, and ministers.

Cunningham had difficulties with Vaughn's new husband, Leland Young, whom she married in 1954 when Cunningham was seven years old. Young "didn't understand children," and often "strapped" Cunningham. Rosa said that Young had no patience or understanding and was very negative toward the young boy. Not surprisingly, Young's beatings did not correct Cunningham's ongoing behavioral problems, and Rosa Vaughn sent Cunningham off to live with Albert Sr. when Cunningham was eight years old. Although the most vivid descriptions of Albert Sr. came from Cunningham himself, Rosa Vaughn explained that by the time she sent Cunningham to live with his father, Albert Sr. was an alcoholic, drug-dealer, pimp, and a gambler. She recalled Albert Sr. once beating Cunningham so badly that blood flowed from Cunningham's penis.

Vaughn testified, and Cunningham later confirmed, that when he was eight years old he stole his uncle's car. Vaughn did not discipline Cunningham for that particular foray into joyriding, but did tell him it was wrong to steal. Nonetheless, Cunningham began to steal property with increasing frequency. He stole another child's bicycle even though he had a new one himself. A neurologist eventually told Vaughn that Cunningham had a compulsion to steal from people.

Around this same time in Cunningham's adolescence, he began to show signs of violence. At age 12, he was placed in juvenile hall for throwing rocks at a playmate's mother. This was Cunningham's first incarceration, but certainly not his last. He spent much of the remainder of his youth in detention facilities, mostly for stealing cars.

Vaughn testified as to Cunningham's difficulties following his release from prison after serving a sentence for

auto theft in the early 1970s. Cunningham, by then an adult, had met and married Sharon Spears, with whom he fathered a daughter, Felicia. The marriage was an unhappy one, however, and Spears decided to leave Cunningham. This sent Cunningham into a deep depression, and he attempted suicide in 1972 by shooting himself with either a rifle or a shotgun. The gun moved as Cunningham pulled the trigger, and instead of being struck in the chest, as planned, Cunningham was wounded by a bullet in the abdomen. He required eight hours of surgery and a year to recover, and the injury caused him ongoing problems with gastritis and pancreatitis.

Vaughn spoke about Cunningham's prior murder conviction for the killing of Ella Mae Fellows. She also spoke about Cunningham's shootout with police in which he shot an officer three times in the chest. She said that Cunningham showed remorse for both crimes and explained that he was hallucinating on drugs.

Vaughn spoke at length about Cunningham's positive contributions whenever he was in prison. She believed that Cunningham had become "institutionalized" and that he could help fellow prisoners if given a life sentence in lieu of the death penalty. She testified about letters he had written to her asking for books so he could help illiterate inmates learn to read and write. He also completed bible and ministry courses in prison, eventually becoming an ordained minister. He helped his fellow prisoners find their own spirituality.

Vaughn also focused on the positive view guards and other officers held of Cunningham. She read several laudatory "chronos" that corrections officers had written. These reports described Cunningham as a helpful, conscientious inmate who was a positive influence on others.

Vaughn read the name and rank of each officer who had submitted these many positive prison reports.

Vaughn also testified about Felicia Cunningham and Sharon Spears. Vaughn explained that Felicia had spent a considerable amount of time living with her, and that Sharon Spears also shared frequent stories about Felicia and her accomplishments.

Finally, Vaughn wept, telling the jury that Cunningham "is my only child," and that without him, "I just would have nobody left." She pleaded with the jury to give Cunningham a life sentence.

The next defense witness was Johnnie Washington, a minister from Cunningham's church who was living in a rented room at Rosa Vaughn's house on the night of the murder. He testified that he loved Cunningham as a person and as a brother in Christ. He told the jury of a powerful sermon Cunningham had delivered to their congregation in the months before the murder. He testified that Cunningham had also taught Sunday school and organized a youth choir.

Marilyn Cox, a worker from Cunningham's employer, briefly testified that Cunningham had worked as a temp for a few weeks. She confirmed that he was working at Kaiser Permanente at the time of his arrest.

The final defense mitigation witness was Cunningham himself. He testified about his terrible childhood, repeating much of the testimony given by his mother.

Cunningham provided further details about the negative role his father played in his childhood. Albert Sr., who had

also served time in prison, told Cunningham that being in jail was "no thing." He also showed Cunningham the guns he kept in the house, eventually teaching Cunningham how to shoot. Cunningham testified that, under his father's tutelage, he became an expert marksman and could easily shoot with one hand. He described his father's house as a brothel. His father's prostitutes would turn tricks while Cunningham was present, and one of the women molested Cunningham sexually when he was eight years old.

Cunningham explained that he was incarcerated for much of his youth because of auto thefts, and this continued into adulthood. In addition to the auto thefts, he discussed the circumstances of his prior felonies. As to the murder of Ella Mae Fellows in 1975, Cunningham claimed that he was not her pimp but that he spent a lot of time with her, protecting her. He claimed that the two of them had taken hallucinogenic drugs and that he only pleaded guilty to murder because he could not remember exactly what happened at the time of her death.

As to the assault with a deadly weapon on a police officer in 1980, Cunningham claimed to be confused as to the officer's identity as a peace officer. Cunningham told the jury that he had slipped out a bathroom window of a gambling house in order to secure his winnings after a card game. When he was pulled over later that night, he thought the officers were trying to rob him. He testified that he was shot twelve times in the incident and only fired in self-defense. He felt remorse for the officer he had shot and later wrote him a letter of apology.

Cumulative to his mother's testimony, Cunningham focused as much as he could on the theory that he was

institutionalized.   He discussed the good works he had performed during his quarter-century in prison, explaining that he had written to thousands of people per month to give them the word of God following his ordination as a minister.

On cross-examination, Cunningham admitted that he had been disciplined in prison for storing marijuana in his rectum, and for sharing a cell with a prisoner who had a weapon.  He also admitted to being dismissed from prison jobs and to taking part in fights.   When confronted with the recent charges of forced sodomy, he explained that he had engaged in consensual sex acts with other male prisoners, but that the county jail allegations against him were false.

The prosecution's case in aggravation painted a much different picture.  The prosecution offered evidence that (1) Cunningham's murder of Ella Mae Fellows was premeditated; (2) Cunningham resisted arrest and intentionally shot a police officer three times during the pursuit and shootout following his cab theft; (3) Cunningham was violent toward his family; and (4) Cunningham was not a model prisoner.

As to the Fellows murder, the investigating officer and coroner testified that Fellows's body turned up in a vacant lot several days after her murder.  There were drag marks and tire tracks, indicating that the body had been dumped there. She was wearing a blue-gray pantsuit and had eight stab wounds over her left breast, many of which would have been instantly fatal.  Officers searched Cunningham's apartment and found a bloody steak knife like the one used in the killing, a box with Jesus Christ's image on the cover containing a Polaroid photo of Fellows wearing the exact blue-gray pantsuit worn at her death, and a magazine

depicting a horror movie in which the fictional victim had wounds similar to Fellows's. Cunningham was later arrested driving Fellows's car.

As to Cunningham's shootout with police, one of the officers involved testified that he and his partner received a description of a stolen cab while on patrol. They saw the cab, pulled it over, and told the driver to "freeze." The driver, Cunningham, sped away in the cab, leading the officers on a high-speed chase. He eventually collided with a parked car before fleeing on foot. As the officers raced around a corner, Cunningham turned and shot one of them three times, propelling the officer fifteen feet backwards and causing him to lose consciousness. Miraculously, Cunningham hit the officer twice in his bullet-proof vest and once in his belt buckle. The officer recovered, but suffered from depression and eventually left the force.

While on parole from his assault with a deadly weapon sentence, Cunningham had a violent clash with Sharon Spears, his ex-wife. In the summer of 1985, just a few months before the Treto murder, Spears became upset when she caught Cunningham cheating. Cunningham reacted by beating her with a paddle. Spears summoned the police and Cunningham was sent back to prison.

Finally, as to his pre-trial behavior in the Los Angeles County Jail, the prosecution presented evidence of Cunningham's forced sodomy charge. One of Cunningham's fellow inmates from the Los Angeles County "pill module" testified that he saw Cunningham strike a fellow prisoner on the head, force him to his knees, put him in a full-nelson headlock, and insert his erect penis into the victim's rectum. The act did not appear consensual to the eyewitness.

Based on all of this evidence, the jury rendered a verdict of death on September 2, 1988. The trial judge denied Cunningham's post-trial motions and entered judgment in June 1989.

**D**

On automatic direct appeal, the California Supreme Court affirmed Cunningham's conviction and death sentence. *See People v. Cunningham*, 25 Cal. 4th 926 (2001). The U.S. Supreme Court denied Cunningham's petition for certiorari. *Cunningham v. California*, 534 U.S. 1141 (2002).

In 1998, while his direct appeal was still pending before the California Supreme Court, Cunningham also filed with that court a petition for a writ of habeas corpus. The court denied the petition in a summary order in 2002.

Cunningham filed his federal habeas petition on September 10, 2004. The district court denied the petition on May 1, 2009.[1]   Cunningham sought a Certificate of Appealability for ten of the fifteen claims raised in his petition, and the district court granted a Certificate for all ten.

**II**

We review de novo the district court's denial of habeas corpus relief. *Estrella v. Ollison*, 668 F.3d 593, 597 (9th Cir.

---

[1] The district court held an evidentiary hearing on two of Cunningham's claims. The parties concede that under the Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), we may not consider evidence raised for the first time during the district court's evidentiary hearing. Our decision thus rests solely on the record before the state court.

2011). We grant much greater deference, however, to the underlying state court decisions in this case. Because Cunningham filed his federal habeas petition in 2004, our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Under AEDPA, we defer to the state court's merits-based disposition of Cunningham's claims unless the state's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under § 2254(d)(1), a decision is an "unreasonable application" of clearly established federal law if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Holland v. Jackson*, 542 U.S. 649, 652 (2004) (per curiam) (internal quotation marks omitted). Under § 2254(d)(2), a state court makes "an unreasonable determination of the facts" when it fails to consider and weigh relevant evidence that was properly presented to it. *Taylor v. Maddox*, 366 F.3d 992, 1000–01 (9th Cir. 2004).

If the state court adjudicates the merits of a claim without articulating its reasoning, a reviewing federal court must examine the record supporting the decision under the same

deferential AEDPA standard. *See Greene v. Lambert*, 288 F.3d 1081, 1088–89 (9th Cir. 2002) (citing *Delgado v. Lewis*, 223 F.3d 976, 981–82 (9th Cir. 2000)). With this deferential standard in mind, we turn to Cunningham's ten claims.

## III

As stated above, Cunningham's claims can be grouped into three categories. First, Cunningham argues that Assistant District Attorney Susan Wondries committed misconduct during the guilt phase of his trial. Second, he argues that he suffered ineffective assistance of counsel during both the guilt and penalty phases of the trial. Third, he argues that his arresting officer violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and that his statement to the officer should have been excluded.

## A

We first address Cunningham's claims of prosecutorial misconduct. Cunningham argues that A.D.A. Wondries failed to disclose evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). He also argues that she improperly implied that he changed his appearance for trial to avoid identification by witnesses.

## 1

In *Brady*, the Supreme Court held that the prosecution's failure to disclose material evidence to a criminal defendant violates the defendant's right to a fair trial. To state a claim under *Brady*, a criminal defendant must establish that (1) the withheld evidence was favorable to the defendant; (2) the

government suppressed the evidence; and (3) the government's suppression prejudiced the defendant. *See Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011) (applying the *Brady* test). Under *Brady*'s suppression prong, if "the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence," the government's failure to bring the evidence to the direct attention of the defense does not constitute "suppression." *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (quoting *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978)).

The *Brady* rule was clearly established federal law in 2002 when the California Supreme Court denied Cunningham's state habeas petition. *See Benn v. Lambert*, 283 F.3d 1040, 1052 (9th Cir. 2002) (explaining *Brady* constitutes clearly established Supreme Court precedent). The California Supreme Court did not articulate its reasoning for denying Cunningham's *Brady* claims so we must review the facts independently to determine whether the court's decision was unreasonable. We hold that it was not.

In Cunningham's first *Brady* claim, he argues that A.D.A. Wondries suppressed victim Cebreros's medical records. Cunningham's claim is similar to the petitioner's complaint in *Raley*. 470 F.3d at 803–804. In that case, the petitioner argued that the prosecutor suppressed the petitioner's own medical records. We held that, because the petitioner "possessed the salient facts regarding the existence of the records he claims were withheld" such that defense counsel "could have sought the documents through discovery," there was no suppression under *Brady*. *Id.* at 804 (citing *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983)). Applying *Raley*, Cunningham's attorneys possessed the "salient facts" that would have allowed them to access

Cebreros's medical records. They knew he had been shot and was treated by medical personnel following the shooting. There was no suppression of this easily attainable evidence.

In Cunningham's second *Brady* claim, he argues that A.D.A. Wondries suppressed Treto's autopsy report. The report inventoried $455.25 in cash found on Treto's person after the shooting. Cunningham's attorneys were obviously aware that Treto had been killed. They could have easily sought his autopsy report through discovery. Moreover, the record demonstrates that Wondries offered the autopsy report as an exhibit at trial, and the report was admitted into evidence with no objection from the defense. Because the report was available to defense counsel and the jury as admitted evidence, it was not suppressed under *Brady*. Thus, the California Supreme Court did not unreasonably deny Cunningham's *Brady* claims.

**2**

Cunningham's other prosecutorial misconduct claim relates to Wondries's argument about Cunningham's changed appearance.

On at least ten different occasions between September 1986 and April 1988, while Cunningham was incarcerated awaiting trial, Cunningham's attorneys requested that he be able to see a dentist because of severe dental hygiene issues. His teeth were so bad that a dentist eventually had to remove them all. The resulting toothlessness prevented Cunningham from eating properly for months until he finally received dentures before trial. The dentures did not include a gold front tooth.

During her opening statement, Wondries highlighted Cunningham's appearance, arguing that it was substantially different from when he was arrested. She listed for the jury that Cunningham "has shaved differently than the night of the incident. And the hair is completely different now, very, very short. And he's had some dental work done." She then displayed photographs of Cunningham taken shortly after his arrest, telling the jury that "[y]ou can see the difference. He's done a lot to try and change his appearance." Cunningham argues that this focus on his appearance was improper because his dental work was medically necessary.

On direct appeal, the California Supreme Court denied this claim on procedural grounds in a reasoned opinion. *People v. Cunningham*, 25 Cal. 4th at 1000. The court explained that "[a]s a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety." *Id.* (internal quotation marks omitted) (brackets in original) (quoting *People v. Ayala*, 23 Cal. 4th 225, 284 (2000)). Cunningham's attorneys did not object to Wondries's opening statement and failed to seek an admonition. Because an admonition could have cured the error, the court held Cunningham's claim procedurally barred. *Id.*

As the Supreme Court explained in the line of federalism cases beginning with *Michigan v. Long*, 463 U.S. 1032 (1983), federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (denying habeas relief).

The rule "is based upon equitable considerations of federalism and comity" and applies when a state court denies a claim on procedural grounds. *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997).

In this case, the California Supreme Court devoted two full paragraphs to its holding that Cunningham's claim was procedurally barred. *People v. Cunningham*, 25 Cal. 4th at 1000–01. Given this adequate and independent state procedural ground, *see Rich v. Calderon*, 187 F.3d 1064, 1070 (9th Cir. 1999), and because Cunningham has not shown an exception to the procedural rule, *see* discussion of ineffective assistance of counsel *infra*, we may not consider this claim on federal habeas review. *See Correll v. Stewart*, 137 F.3d 1404, 1416–18 (9th Cir. 1998).

## B

We now turn to Cunningham's claims of ineffective assistance of counsel. Cunningham argues that his attorneys were ineffective for (1) failing to present evidence of Cebreros's medical records and Treto's autopsy report; (2) failing to present alibi evidence; (3) failing to object to A.D.A. Wondries's closing argument allegedly denigrating defense counsel; (4) failing to object to evidence and arguments about Cunningham's changed appearance; and (5) failing to present additional mitigating evidence at the penalty phase. The California Supreme Court rejected these claims in its summary denial of Cunningham's state habeas petition.

The Supreme Court established the law state courts must apply when reviewing ineffective assistance claims in *Strickland v. Washington*, 466 U.S. 668 (1984). To prove ineffective assistance under the familiar *Strickland* standard,

Cunningham had to demonstrate to the state court (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000) (quoting *Strickland*, 466 U.S. at 688, 694) (internal quotation marks omitted).

Under *Strickland*'s first prong, Cunningham was required to show that his counsels' performance "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, or was "outside the wide range of professionally competent assistance," *id.* at 690. In reviewing counsels' performance under this first prong, the state court must "begin with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy.'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1404 (2011) (alteration in original) (quoting *Strickland*, 466 U.S. at 689). The court must be "highly deferential," and must evaluate the challenged conduct from the perspective of defense counsel. *Strickland*, 466 U.S. at 689.

Under *Strickland*'s second prong, Cunningham was required to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Cunningham would have had to show "a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 131 S. Ct. at 1403 (quoting *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011)).

Because AEDPA's standard of review applies here, we take the already-deferential review of counsel's performance

mandated by *Strickland* and magnify it "through the 'deferential lens of § 2254(d).'" *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009)). Our review of Cunningham's ineffective assistance claims "is thus 'doubly deferential.'" *Id.* (quoting *Mirzayance*, 556 U.S. at 123). To prevail under this difficult standard, Cunningham "must demonstrate that it was necessarily unreasonable for the California Supreme Court to conclude: (1) that he had not overcome the strong presumption of competence; and (2) that he had failed to undermine confidence in the jury's sentence of death." *Id.*

## 1

As an analogue to his *Brady* claims, Cunningham argues that his attorneys were ineffective in failing to investigate (1) Cebreros's medical records indicating an entry wound to the *front* of his thigh; and (2) Treto's autopsy report documenting the discovery of $455.25 on Treto's person or in his effects after the shooting. Because the state has conceded that attorneys Udovic and Bennett were deficient in failing to address this evidence, we need only decide whether Cunningham was prejudiced.

As to the first claim regarding Cebreros's medical records, Cebreros testified at trial that he was shot in the *back* of the leg as he ran away from Cunningham. He testified that he was shot through the thigh with the bullet exiting the front of his leg, known colloquially as a "through and through" wound. Officer Thomas, one of the officers at the scene shortly after the shooting, and Paramedic English, who was also early to the scene, both originally noted in their reports that the bullet entered the front and exited the back of Cebreros's leg, contrary to Cebreros's testimony at trial.

Bennett presented this apparent inconsistency to the jury. He read from Thomas's report that "[Victim] No. 2 was found to have single gunshot wound in upper right leg. Possibly entry wound in the front of the leg, the exit wound in the back of the same leg." Likewise, Paramedic English testified that "my report stated that the wound was—that entered here and exited—well, entered in the front of his thigh and exited in the back of his thigh." Udovic presented this report to the jury, highlighting the entry- and exit-wound notations.

Sheriff's Deputy Robert R. Hawkins, the prosecution's ballistics expert, was not at the scene of the crime and did not examine Cebreros's wound. He did view photos of Cebreros's leg, however. He concluded that "it would be very difficult—impossible—for me to tell you which was entry, which was exit." He stated that "both the front and the back look similar." On cross-examination, Bennett asked Hawkins if he could have determined an entry or exit wound if he had examined Cebreros at the scene. Hawkins explained that he would "probably rely more upon the clothing than the leg itself," presumably by looking for powder residue. Bennett then asked if Hawkins was ever shown Cebreros's pants, and Hawkins stated that he was not.

In his closing argument, Bennett called attention to these discrepancies in the entry- and exit-wound descriptions. He specifically noted that Hawkins was never able to view Cebreros's pants to develop an expert opinion on the issue. Bennett highlighted the fact that both English and Thomas originally described the wound as entering the front of Cebreros's thigh. And he made plain the adverse inference the jury could draw from the discrepancy: "Mr. Cebreros isn't really telling us what happened out there that night." Bennett

concluded his discussion of the entry and exit wounds by telling the jury that "[t]hey don't want you to know the real answer to this because it might have thrown their case into a tizzy."

Cebreros's medical charts were not discussed at trial. Huntington Emergency Room physician Dr. Robert Goldweber later stated in a declaration filed during Cunningham's state habeas proceedings that he made notations on Cebreros's chart indicating a possible entry wound on the front of the thigh and an exit wound on the back. Likewise, Nancy Rogers, R.N., the emergency room nurse who also treated Cebreros after the shooting, stated in a declaration filed during state habeas proceedings that her notes indicated a frontal entrance wound and rear exit wound. Cunningham argues that he was prejudiced by counsel's failure to present these reports at trial. The district court correctly recognized that he was not.

Cebreros's medical records would have been cumulative of evidence already presented to the jury. Bennett discussed the entrance- and exit-wound discrepancy at length during his examinations of Officer Thomas, Paramedic English, and Deputy Hawkins. And he hammered on the issue during closing argument. Given all this evidence and argument, it is highly doubtful that additional notations from non-experts showing a "possible" frontal entry wound would have discredited Cebreros's testimony any further as to create a reasonable probability that the outcome of the trial would have been different.

As to the second claim regarding Treto's autopsy report, the report includes a notation that $455.25 was returned to Treto's wife by the Medical Examiner's Office. Cunningham

argues that, had counsel properly presented this evidence, he could have impeached Cebreros's testimony that a robbery had taken place. This claim also fails, however, because even if the jury had known about the money, there was still ample evidence supporting a robbery conviction.

First, it was not unreasonable for the California Supreme Court to hold that, even if presented with evidence of $455.25 discovered on Treto's person, the jury would still have found that Treto had been robbed of money. Treto's wife testified at trial that, on the night of the murder, Treto left home with around $1,400 or $1,500 in cash, and that he kept the money hidden on various parts of his body, including his wallet. Officer Thomas testified that he found two dollars and two cents on the ground around Treto as well as eight $1 bills in Treto's front pants pocket. But he also explained that Treto's wallet, shirt, and jacket contained no money and that one of Treto's shoes had been removed while the other was left on. Together, this evidence would indicate a partially successful and hurried search for money by Treto's killer. The jury properly considered this evidence and reasonably found that a robbery had been committed even though the robber did not steal every last dollar. The jury could have reasonably maintained this finding even if confronted with evidence of additional money on Treto's person.

Second, even if the jury had found that Treto was not robbed of cash, it would have found that he was still robbed of his automobile. Treto's Buick was missing after his murder. Cebreros testified that Cunningham shot Treto while Treto was holding his keys at the driver's side door. Two law enforcement officers reported seeing a similar car being driven away from the scene by a driver matching Cunningham's description. Given this substantial

circumstantial evidence that a robbery had taken place—both of cash and car—it was not unreasonable for the California Supreme Court to rule that Cunningham was not prejudiced by counsels' failure to probe deeper into the remaining cash on Treto's person.

**2**

Cunningham also claims he suffered ineffective assistance of counsel due to Udovic and Bennett's failure to present alibi evidence. At trial, Detective Baroni recounted that Cunningham stated during his post-arrest interview that he had gone home around 10:00 p.m. on the night of the murder, arrived to a dark house where everyone was asleep, and went straight to bed.

Cunningham argues that three important pieces of supporting evidence were not presented to establish an alibi. First, Cunningham's mother, Rosa Vaughn, submitted a declaration in Cunningham's state habeas proceeding explaining that Cunningham returned to her home "between 2:00 and 2:30 a.m." on the night of the murder. She said she was awake painting the den at the time. Rosa Vaughn was not called to testify at the guilt phase of the trial.

Second, Aubrey Vaughn, Rosa Vaughn's husband, submitted a declaration during state habeas proceedings, stating that he saw Cunningham early the next morning when Cunningham was getting ready for work. Aubrey Vaughn was not called to testify at trial.

Third, Cunningham's ex-wife, Sharon Spears, submitted a declaration in Cunningham's state habeas proceedings

stating that Cunningham did not stay at her home the night of the murder. Spears was not called to testify at trial.

As the district court observed, Cunningham's proffered alibi evidence is extremely weak. First, the evidence is consistent with Cunningham's guilt. Cunningham's arrival at his mother's home two miles from the murder scene shortly after the murder took place would seem to support the notion that he drove directly home from the Pair of Aces after robbing and murdering Treto and wounding Cebreros. Aubrey Vaughn and Sharon Spears's statements would also support this finding. Second, Rosa Vaughn's declaration would tend to show that Cunningham lied to the police about his whereabouts on the night in question. Thus, the California Supreme Court reasonably determined that Udovic and Bennett were not ineffective for failing to present this evidence.

**3**

Cunningham also argues that he suffered ineffective assistance of counsel when Udovic and Bennett failed to object to Wondries's comments denigrating the defense team during her closing argument. Wondries's allegedly improper comments included:

> You know, the judge told you earlier that you have three very fine attorneys, and I have to tell you it's really been a pleasure being able to work with Mr. Udovic and Mr. Bennett. You have seen them in action. They are extremely fine. And what is their job? Their job is to create straw men. Their job is to put up smoke, red herrings. And they've done a

heck of a good job. And my job is to
straighten that out and show you where the
truth lies. So let's do that.

As we explained in *United States v. Necoechea*, 986 F.2d
1273, 1281 (9th Cir. 1993), "[b]ecause many lawyers refrain
from objecting during opening statement and closing
argument, absent egregious misstatements, the failure to
object during closing argument and opening statement is
within the 'wide range' of permissible professional legal
conduct." Under *Necoechea*, Udovic and Bennett's decision
not to object to Wondries's comments, possibly to avoid
highlighting them, was a reasonable strategic decision.

Under *Strickland*'s second prong, even if Udovic and
Bennett should have objected, there is no reasonable
likelihood that the outcome of Cunningham's trial would
have been different had Wondries's statement been stricken
from the record. The comments were a single paragraph of
a twenty-page argument and the trial judge explained to the
jury that closing arguments are not evidence. *See
Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991)
(holding, on habeas review, that counsel's failure to object to
improper argument at trial did not prejudice petitioner where
other evidence supported a guilty verdict and the jury was
told closing argument was not evidence).

Moreover, we have explained that "prosecutors must have
reasonable latitude to fashion closing arguments, and thus can
argue reasonable inferences based on the evidence, including
that one of the two sides is lying." *Necoechea*, 986 F.2d at
1276. Thus, in prior cases, we have ruled that comments
similar to those made in this case did not constitute plain
error, meaning that they did not have "an impact on [the

defendant's] substantial rights." *See United States v. Matthews*, 240 F.3d 806, 819 (9th Cir. 2001), *rev'd on other grounds*, 278 F.3d 880, 882 (9th Cir. 2002) (en banc) (upholding the parts of the original three-judge panel pertaining to the defendant's conviction, including the discussion of prosecutorial misconduct).  For these reasons, we hold that the California Supreme Court did not unreasonably apply *Strickland* in denying this particular ineffective assistance claim.

**4**

As an analogue to another of his prosecutorial misconduct claims, Cunningham argues that Udovic and Bennett were ineffective for failing to object to Wondries's opening statement and follow-up evidence relating to Cunningham's changed appearance.

As stated above, Wondries noted for the jury Cunningham's changed hair, facial hair, and teeth during her opening statement.  Wondries also elicited testimony from Cebreros, Keith Anderson (the man who played pool with Cunningham at Riley's bar), and Officers Delgado and Baroni that Cunningham's appearance had changed.  The men testified that: (1) Cunningham's hair was shorter at trial and had gray or white in it not present at the time of the incident or arrest; (2) Cunningham's facial hair was changed in that he no longer had a goatee; (3) the rims of Cunningham's glasses were darker the night of the incident than they were at trial; (4) Cunningham had lost weight since his arrest; and (5) the gold ring or cap on Cunningham's upper tooth was no longer there.  As to the missing gold tooth, Wondries asked the court to direct Cunningham to stand up and reveal his teeth to the jury.  With no objection

from Udovic or Bennett, Cunningham complied, showing that he no longer had the gold cap.

In response to Wondries's elicitation of testimony concerning Cunningham's changed appearance, Bennett offered Cunningham's county jail medical records into evidence as Exhibit 25. Wondries did not object. The medical records demonstrate that Cunningham had several teeth removed for decay.

In his closing argument, Bennett directly addressed the evidence of changed appearance. He told the members of the jury that they could review Cunningham's dental records to see that his teeth, including his gold tooth, were only replaced because they were "rotting out of his head." Bennett explained to the jury that:

> Ms. Wondries would have you infer from the changes in [Cunningham's] appearance that he's, somehow, undertaken a conscious effort to change his appearance. That's not true. The reasonable inferences from [Cunningham's] change in appearance have nothing to do with [Cunningham's] trying to deceive you, somehow, but, rather, with the fact he's lost 35 pounds because jail food isn't wonderful . . . .

Under the first prong of the *Strickland* test, counsels' conduct did not fall below an objective standard of reasonableness. As explained above, withholding objections to an opponent's opening statement is acceptable defense strategy. *See Necoechea*, 986 F.2d at 1281.

As to whether Cunningham was prejudiced by Udovic and Bennett's failure to object to Wondries's statement and follow-up evidence, we hold that he was not. Bennett adequately addressed Wondries's statement and all the witness testimony about Cunningham's dental work by offering documentary evidence that Cunningham changed his teeth due to medical necessity. He further highlighted the point during closing argument.

Moreover, although the gold tooth was certainly an important part of the changed appearance, Cunningham has identified no medical necessity for cutting his hair short, wearing different glasses, or shaving his goatee. Thus, even without any reference to Cunningham's teeth, Cunningham still changed his appearance through strictly voluntary measures from which the jury could have properly inferred consciousness of guilt. *See United States v. Foppe*, 993 F.2d 1444, 1450 (9th Cir. 1993). It was thus not unreasonable for the California Supreme Court to deny this claim under *Strickland*.

**5**

Finally, Cunningham claims that Udovic and Bennett were ineffective because they failed to adequately investigate and present further mitigating evidence at the penalty phase. Cunningham argues that the defense should have called as witnesses (1) Sharon Spears, his ex-wife; (2) Felicia Cunningham, his daughter; (3) Rudy Fehrenkamp and Art Knoll, corrections officers at San Quentin State Prison; and (4) Dr. William Vicary or Dr. Michael Coburn, psychiatrists who had previously examined Cunningham.

Udovic and Bennett appear to concede that their performance was deficient at the penalty phase. We thus choose to address the California Supreme Court's application of *Strickland*'s prejudice prong. Under this prong, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. This inquiry requires us to "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

The Supreme Court's recent rejection of a penalty-phase ineffective assistance claim in *Cullen v. Pinholster* is instructive here. 131 S. Ct. 1388 (2011). In that case, the petitioner presented mitigating testimony from his mother, explaining his terrible childhood and his many periods of incarceration. *Id.* at 1408–09. The state presented aggravating evidence of the petitioner's prior violent crimes, his misbehavior in prison, and his history of domestic violence. *Id.* at 1408. The jury returned a verdict of death. In his state habeas proceedings, the petitioner presented additional evidence of his abusive upbringing as well as expert psychiatric evidence of his "psychopathic personality traits." *Id.* at 1405. The Supreme Court, applying AEDPA deference, held that, because the new evidence (1) would have been cumulative; and (2) would have opened the door to aggravating evidence, "[t]here is no reasonable probability that the additional evidence . . . would have changed the jury's verdict." *Id.* at 1409. We reach the same conclusion in this case.

Cunningham argues that he was prejudiced by not having Sharon Spears and Felicia Cunningham testify on his behalf.

Both submitted declarations in the state habeas proceeding. Sharon Spears would have testified that she loved Albert and that, besides his unfaithfulness, he was a good husband. Felicia Cunningham would have testified that she loved her father and she would have pleaded for his life. She also would have testified that her father "was never violent towards me, my half-brother Uriah, or my mother." The California Supreme Court did not unreasonably deny this claim.

First, this "new" testimony was cumulative of testimony already presented describing familial love for Cunningham. *See Pinholster*, 131 S. Ct. at 1399. Rosa Vaughn and Johnnie Washington adequately showed that Cunningham was loved and had family who would miss him. Rosa Vaughn discussed Felicia and Sharon Spears, giving the impression that they were a relatively close-knit family and demonstrating to the jury that Cunningham was a loving husband and father. Cunningham himself read many thoughtful cards and poems he had created for Spears and Felicia, showing that he cared deeply for them. Thus, the primary mitigation value of Spears and Felicia Cunningham's testimony was adequately presented at the penalty phase.

Second, Spears and Felicia Cunningham would have been subject to thorough cross-examination. Had Spears attempted to testify that Cunningham was a good husband, the prosecution would have certainly confronted her with the recent police complaint she filed against him for beating her with a paddle. *Cf. Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (denying habeas claim of penalty-phase ineffectiveness because "if defense counsel had attempted to put on evidence that petitioner was a family man" it would have opened the door to aggravating evidence of his

transgressions). Likewise, if Felicia Cunningham testified that Cunningham was never violent, the prosecution would have asked her about his recent violence against her mother. *See id.* ("Any attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions."). Given this inevitable aggravating evidence, it was not unreasonable for the California Supreme Court to determine that Cunningham was not prejudiced by the absence of Spears and Felicia Cunningham's testimony.

Cunningham next argues that his counsel should have elicited testimony from Corrections Officers Rudy Fehrenkamp and Art Knoll. The officers worked at San Quentin while Cunningham was imprisoned there. Both officers would have testified, as stated in their declarations in the state habeas proceeding, that they found Cunningham to be a very good inmate who made his unit "a pleasant environment for everyone."

The California Supreme Court reasonably determined that Cunningham was not prejudiced by counsel's failure to present this testimony. First, the evidence would have been cumulative of Rosa Vaughn's testimony. Vaughn read at least four laudatory reports from corrections officers, reports that are practically identical to those filed by Fehrenkamp and Knoll. Cunningham also spoke at great length about his positive relationships with officers and his good behavior in prison. The jury certainly considered that some corrections officers had positive views of Cunningham, even without Fehrenkamp and Knoll's testimony.

Second, Fehrenkamp and Knoll would have been easy targets for the prosecution on cross-examination. The two

had only known Cunningham for a few months out of his decades of incarceration. They also had no knowledge of the recent sodomy charge brought against Cunningham in 1986.

Finally, Cunningham argues that he was prejudiced by his counsels' failure to call Dr. William Vicary, a psychiatrist who evaluated Cunningham in 1988, or Dr. Michael Coburn, a psychiatrist who evaluated Cunningham in 1975. Dr. Vicary would have (1) testified about Cunningham's nightmarish childhood; and (2) concluded that Cunningham suffered from a "chronic underlying depressive mental illness" for which alcoholism was "a major exacerbating factor." Dr. Coburn would have testified that Cunningham was too intoxicated at the time of the Fellows murder to have acted deliberately.

The California Supreme Court did not unreasonably apply *Strickland*'s prejudice prong to Dr. Vicary's testimony.[2] As to Cunningham's childhood, Dr. Vicary's testimony would have "largely duplicated the mitigation evidence at trial" presented personally by Cunningham and his mother. *Pinholster*, 131 S. Ct. at 1409.

As to the evidence that was not presented to the jury, namely Dr. Vicary's expert opinion that Cunningham suffered "chronic underlying depressive mental illness," the jury could have easily inferred on its own that such illness plagued Cunningham. He testified personally to depression so deep that it caused him to attempt suicide. A psychiatrist's

---

[2] The dissent incorrectly infers from this sentence that we "apparently conced[e] that Cunningham's counsel was deficient." Dissent at 45. We make no such concession. We merely find that we can resolve Cunningham's claim on the prejudice prong alone.

testimony furthering that description could have actually hurt Cunningham by showing the jury that he was "simply beyond rehabilitation." *Id.* at 1410 (citation omitted). As to his chronic alcoholism, Cunningham testified that he drank consistently all through his life after his father gave him alcohol when he was eight years old. The jury heard Cunningham's own admission that "I can do anything under the influence of alcohol."

Moreover, as was the case in *Pinholster*, Dr. Vicary's testimony "would have opened the door to rebuttal by a state expert." *Id.*; *see also Wong v. Belmontes*, 130 S. Ct. 383, 388 (2009) (explaining that "expert testimony discussing [petitioner's] mental state, seeking to explain his behavior, or putting it in some favorable context would have exposed [petitioner] to" damaging evidence in aggravation). Given that the state could have called a rebuttal expert, "counsel faced a serious risk that a mitigation case could turn out to be aggravating." *Pinholster v. Ayers*, 590 F.3d 651, 707 (9th Cir. 2009) (en banc) (Kozinski, C.J., dissenting), *rev'd sub nom. Cullen v. Pinholster*, 131 S. Ct. 1388 (2011).

The principal flaw in the dissent's analysis is its complete failure to apply the "doubly deferential" standard of review under 28 U.S.C. § 2254(d). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Instead of asking whether it was objectively unreasonable for the California Supreme Court to conclude that Cunningham had not shown that Dr. Vicary's opinion would undermine confidence in the jury's imposition of death as the appropriate penalty, the dissent simply reweighs the defense case as if reviewing the question on direct appeal. Doing so ignores the Supreme Court's admonition in *Harrington v. Richter*, 131 S. Ct. 770 (2011), that we do not grant habeas relief overturning the California Supreme

Court's *Strickland* analysis unless we can say no "fairminded jurists could disagree" that its application of *Strickland* was objectively unreasonable. *Id.* at 786 ("It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. If this standard is difficult to meet, that is because it was meant to be.") (citation omitted)).

Dr. Coburn's testimony about Cunningham's mental state at the time of the Fellows murder would also have been cumulative. Cunningham and Rosa Vaughn both testified that Cunningham was under the influence of drugs and could not remember the details of Fellows's death. Dr. Coburn's testimony would also have invited rebuttal testimony.

## C

Cunningham argues that the trial court erred in admitting Detective Baroni's testimony about Cunningham's post-arrest interview in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1981). On direct appeal, the California Supreme Court determined that Cunningham suffered no such violation. Cunningham argues that the court's decision was both an unreasonable application of clearly established law and was based on an unreasonable determination of the facts.

On December 16, 1985, Detective Baroni and his partner interviewed Cunningham in a Pasadena City Jail interview room. The interview was not tape-recorded. At trial, Udovic moved to exclude evidence of Cunningham's interview and the court conducted an evidentiary hearing out of the presence of the jury.

Detective Baroni testified that he advised Cunningham of his *Miranda* rights and Cunningham signed a waiver form recording Cunningham's initialed responses to each warning. After Cunningham was advised of his rights, he said, "I want to have an attorney present. I will talk to you now until I think I need one. I don't need one present at this time." Baroni then asked him, "Do you want to talk to an attorney or do you want to talk to me without an attorney?" to which Cunningham replied, "I'll talk to you until I think I need an attorney." Baroni then repeated the same question and received the same answer. While Baroni conceded that he may have said something to Cunningham immediately after Cunningham said "I want an attorney," his comments were limited to assuring Cunningham he could have an attorney present.

Cunningham testified to a much different sequence of events. He said that after he requested an attorney, as much as a minute passed before he said "I will talk to you now until I think I need an attorney." Cunningham said that during the interim, Baroni told him not to worry about anything and said "I believe you are innocent." The trial court ultimately credited Detective Baroni's version of events and allowed him to testify to these facts at trial.

The California Supreme Court concluded that Cunningham validly waived his rights based on Baroni's version of the interview. *See People v. Cunningham*, 25 Cal. 4th at 993–94. The court determined that Cunningham's "initial statement"—the "I want an attorney" statement—was "an unambiguous request for counsel." *People v. Cunningham*, 25 Cal. 4th at 993 (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). The court reasoned that, because Cunningham invoked his right to counsel, he "was

not subject to further interrogation by the police until counsel was made available to him." *Id.* Based on Baroni's version of events, however, Baroni's only statement after Cunningham invoked was a clarification that Cunningham could have an attorney present if he wanted one. The court reasoned that this statement did not amount to "interrogation" under *Rhode Island v. Innis*, 446 U.S. 291 (1980), and thus no *Miranda* violation occurred because Cunningham elected to proceed without a lawyer present. *Id.* at 993–94. The court did not unreasonably apply *Miranda*, *Edwards*, or *Innis* in reaching this decision.

Cunningham's alternative *Miranda* argument is that the California Supreme Court's reliance on Baroni's version of the events—as opposed to Cunningham's own self-serving testimony—resulted in a decision based on an unreasonable determination of the facts.

Under AEDPA, we "must be particularly deferential to our state-court colleagues" on questions of fact. *Taylor*, 366 F.3d at 999–1000. There are two sections of § 2254 that govern state court findings of fact: §§ 2254(d)(2) and (e)(1). In reviewing evidence presented to the state court, we rely on § 2254(d)(2). *See Kesser v. Cambra*, 465 F.3d 351, 358 n.1 (9th Cir. 2006). Under § 2254(d)(2), a federal court "may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor*, 366 F.3d at 999 (discussing § 2254(d)(2)).

Looking at the record before us, it was not unreasonable for the trial court and the California Supreme Court to credit Baroni's testimony over Cunningham's. A criminal defendant's vague testimony, standing alone, does not

demonstrate that an officer's contrary version of the facts was wrong. *Cf. Taylor*, 366 F.3d at 1006 (holding that the state court unreasonably credited the officer when the petitioner's attorney provided accurate corroboration of the petitioner's version of the post-arrest interview).

The California Supreme Court also reasonably held that, even if there was a *Miranda* violation, the admission of the unlawfully obtained evidence was harmless. *People v. Cunningham*, 25 Cal. 4th at 994 (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (Rehnquist, C.J., concurring)). Recognizing that Cunningham did not actually confess to the crime during his post-arrest interview, the court reasoned that the statements "at most revealed [Cunningham's] lack of veracity." *Id.* In light of the entire record and the other damaging evidence against him, the court reasonably determined that Cunningham's statement, even if erroneously admitted, was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

### D

Finally, Cunningham argues that cumulative error by the prosecutor, his counsel, and the court requires reversal. A petitioner may demonstrate that "even if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'" *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (quoting *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996)). Reviewing all of Cunningham's claims together as a whole, we fail to see cumulative error requiring reversal.

The district court properly denied Cunningham's petition for a writ of habeas corpus.

**AFFIRMED.**

---

PREGERSON, Circuit Judge, concurring in part and dissenting in part[1]:

The majority concludes that the California Supreme Court was not unreasonable in holding that Cunningham was not prejudiced by his counsel's failure to present Dr. William Vicary, M.D., a psychiatrist, as a mitigating witness during the penalty phase of his trial. The majority reasons that Dr. Vicary's testimony would have been duplicative and would have opened the door to a "damaging" rebuttal by a state expert.

In doing so, the majority fails to consider that this evidence would have gone directly to three of the eleven factors the jury was required to consider in evaluating whether death or life without the possibility of parole was the appropriate sentence under California Penal Code § 190.3. Furthermore, without Dr. Vicary's testimony, the jury was presented with no direct scientific testimony demonstrating that "at the time of the offense the capacity of the defendant

---

[1] Like the majority, I would affirm the district court's denial of habeas relief on Cunningham's *guilt-phase* ineffective assistance of counsel claims. Cunningham cannot establish "a reasonable probability that, had the evidence been disclosed to the defense, the result of the [guilt-phase] would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). I also concur in the majority's resolution of Cunningham's non *penalty-phase* ineffective-assistance claims.

to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication." Cal. Penal Code § 190.3. Dr. Vicary's testimony would have filled that gap. He would have explained that as a result of Cunningham's horrific childhood, Cunningham was later unable to "conform his behavior to society's norms." Thus, Dr. Vicary's testimony would have been the *only* scientific evidence directly demonstrating the "causal nexus" between Cunningham's abusive childhood and his crime.

I would hold that, based on the record before it, the California Supreme Court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984). I would thus grant Cunningham's habeas relief on his penalty-phase ineffective assistance claim.

## I.

"An ineffective assistance of counsel claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

Under 28 U.S.C. § 2254(d)(1), a federal court may only grant a state prisoner habeas relief if the state court's adjudication of the prisoner's claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Section 2254(d)(1)'s "unreasonable application" applies even where, like here, there has been a summary denial by the California Supreme Court. *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

"Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id*. To satisfy this standard, the petitioner must show that the state court decision was "objectively unreasonable," not just incorrect or erroneous. *Id.* at 785.

## II. Deficient Performance of Cunningham's Counsel

Cunningham claims that his counsel was deficient because his attorneys failed to investigate or prepare a penalty phase defense. Specifically, he alleges that his attorneys failed to call a key expert witness, Dr. Vicary, to testify. The majority fails to discuss the deficiency prong, apparently conceding that Cunningham's counsel was deficient. Thus, the only questions before this court are whether Cunningham's counsel's deficient performance prejudiced Cunningham and if so whether the California Supreme Court was unreasonable in finding a lack of prejudice

## III. Prejudice & Unreasonable Application of *Strickland* by the California Supreme Court

Because we find Cunningham's counsel deficient, we must determine whether the California Supreme Court unreasonably applied *Strickland* in holding Cunningham was not prejudiced by that deficiency. The prejudice prong of *Strickland* requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In California, however, to impose a death sentence, a jury must be unanimous; therefore, Cunningham

need only demonstrate that, but for his counsel's deficiency, there was a "reasonable probability that at least one juror would have" voted against sentencing Cunningham to death. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003); Cal. Penal Code § 190.4(b).

To assess that probability in a capital penalty phase proceeding, we must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. That includes evidence "adduced at trial, and the evidence adduced in the habeas proceeding[s]." *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000). However, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. Accordingly, our review is limited to only the same evidence that was available to the California Supreme Court.

### A. Cunningham was prejudiced by his counsel's failure to call Dr. Vicary to testify because there is a reasonable probability that his testimony would have changed the jury's verdict.

Had Cunningham's attorneys called Dr. Vicary to testify and submitted his report into evidence, there is a reasonable probability that the testimony would have changed at least one juror's vote. Dr. Vicary is a Diplomate of the American Board of Psychiatry and Neurology and a Diplomate of the American Board of Forensic Psychiatry. Over the past twenty-five years, he has been qualified as a scientific expert and has testified at about 500 trials regarding the mental health of criminal defendants. Scientific and expert testimony contains an "aura of special reliability and trustworthiness." *United States v. Amaral*, 488 F.2d 1148,

1152 (9th Cir. 1973). Admissible expert testimony is meant to provide the jury with "appreciable help" in their determinations. *Id.* Here, Dr. Vicary's testimony and report would offer an illuminating medical perspective on Cunningham's behavior by shedding light on his prior convictions, substance abuse, traumatic family background, and mental illness. This evidence would have added significant mitigating weight by appreciably helping the jury to understand Cunningham's mental capacity during his crimes.

Prior to drafting his ten-page medical report, Dr. Vicary met with Cunningham on six different occasions, spoke with Cunningham's mother, reviewed police, autopsy, and recent psychological testing reports, and viewed Cunningham's jail medical chart. From all this information, Dr. Vicary concluded that Cunningham suffered from a "chronic underlying depressive mental illness" for which alcohol was a "major exacerbating factor." He further found that Cunningham has "long-standing serious psychiatric problems." With regard to Cunningham's traumatic family experience, Dr. Vicary noted that those experiences "caused a major impairment in his self-esteem." He further found that Cunningham's problems in school "led to additional negative experiences such as being rejected by peers." Dr. Vicary reported that Cunningham's "sense of unworthiness appears to have led him to sabotage his own success whether that occurred in treatment, work or interpersonal relationships."

Dr. Vicary further noted that Cunningham has "[f]or many years… suffered from symptoms of anxiety and depression" and that alcohol abuse "exacerbated his mental deterioration." He noted that Cunningham would keep his "deeper thoughts and feelings to himself" and "store

frustrations until rare, aggressive outbursts," usually triggered by alcohol, would occur.

Finally, although Dr. Vicary found that it "seems highly likely that [Cunningham's] future adjustment in prison will be positive," Dr. Vicary felt that without proper access to psychiatric treatment and medication in prison, Cunningham's serious psychiatric problems "could culminate in a psychotic breakdown or suicide attempt."

Dr. Vicary made this determination without any prior medical, psychological, social, or family history from Cunningham's trial counsel. Had Dr. Vicary known more about Cunningham's past, Dr. Vicary stated that he would have done further inquiry into Cunningham's potential brain damage. He would have administered a Wexler Adult Intelligence Test and Reitan test. Depending on the result, he would have then ordered a "full battery of neuropsychological testing."

Nevertheless, if called as a witness, in addition to the conclusions from his report noted above, Dr. Vicary would have explained "the negative effects of experiencing such a dysfunctional family life as a child and would have been able to provide some context and explanation for Mr. Cunningham's later apparent inability to conform his behavior to society's norms." He would have further testified that "there is an increased chance of substance abuse in families where there is a pattern of alcoholism . . . [and] [w]ith [Cunningham's] family history, [Dr. Vicary] would have been able to put Mr. Cunningham's alcoholism and other substance abuse in a readily understandable family context." Dr. Vicary also would have explained from a medical standpoint, Cunningham's "violent behavior . . . as

being intimately and directly related to his chronic and acute substance abuse."

### 1. Dr. Vicary's testimony would not have been duplicative.

The majority concludes that this overwhelmingly mitigating yet excluded testimony would have been duplicative of testimony that was already presented to the jury either by Cunningham personally or his mother. I disagree.

First, the majority is incorrect that Dr. Vicary's expert opinion that Cunningham suffered from a "chronic underlying depressive mental illness" could have been "easily inferred" by the jury through Cunningham's own testimony.

The idea that Cunningham in his own trial had the sophistication to articulate his own diagnosis to the jury is completely without merit. There is nothing to suggest that Cunningham was even aware that he suffered from "chronic underlying depressive mental illness."

Moreover, an expert opinion is very different from a lay opinion, especially a defendant's opinion. An expert opinion is one from an objective third party that carries an "aura of special reliability and trustworthiness" and bestows upon the jury "appreciable help" in understanding matters with which they are unfamiliar. *Amaral*, 488 F.2d at 1152; *See* Ivkovic & Hans, Jurors' Evaluations of Expert Testimony: Judging the Messenger and the Message, 28 Law & Soc. Inquiry 441, 445 (2003) (noting that the "majority of jurors" who participated in a study "agreed that expert testimony was crucial to the outcome of their cases" (citing Champagne et.

al., Expert Witness in the Courts: An Empirical Examination, 76 Judicature 5–10 (1992))). A defendant's testimony, on the other hand, may be viewed by the jury as a desperate attempt to save himself. In fact, in this case, Cunningham's counsel conceded during closing arguments that Cunningham did not have much credibility with the jury. His counsel stated: "[Cunningham] would have not much credibility with you. I don't think he has much credibility with you."

Here, the majority assumes the jury is informed in the field of psychiatry enough so that it could deduce from Cunningham's testimony that "such illness plagued" him. The majority also assumes that the jury gave the same weight to Cunningham's testimony as it would Dr. Vicary's testimony. In a case where the result of its affirmation is a death sentence, the majority sadly fails to perceive the impact of its loose assumptions.

Finally, while Cunningham's counsel and the state prosecutor made Cunningham's mental health a factor for the jury to consider in deciding Cunningham's punishment, their arguments could not replace expert mental health testimony. Cunningham's counsel repeatedly implied during their closing arguments that Cunningham was not mentally sound. Cunningham's counsel called him "twisted," "strange," "crazy," and "warped." He said Cunningham's actions did not "make sense" and that "there's something wrong" with Cunningham. He stated that Cunningham, in fact, "needed some psychological help at a very early age." He noted Cunningham took actions that were not justified by "most rational minds." He further stated that Cunningham had a "problem from the git-go."

Indeed, the prosecutor even put the question to the jury whether Cunningham suffered from some mental illness that would in some way account for his behavior. In her closing argument, the prosecutor stated that: "Cunningham described himself as being sick. He needs psychiatric help." She told the jury that Cunningham's sentencing reports stated that "psychological help" was recommended. She commented that Cunningham himself described that he had been "in and out of psychology in the jail system." But, she also argued that "[t]here isn't a magic pill that makes somebody who is this type of person into the type of person that you are." She then told the jury moments later, "If this isn't a case that deserves the death penalty, who does? Who deserves it if this man does not?"

Despite Cunningham's counsel's and the prosecutor's statements that Cunningham had some type of mental deficiency, the jury did not have the benefit of expert testimony to provide direct evidence of such deficiencies. By suggesting a "causal nexus" between Cunningham's abusive childhood and his crime, expert testimony could have "impact[ed] the quality and strength of the mitigation evidence" and offered a persuasive explanation of Cunningham's crimes. *State v. Tucker*, 160 P.3d 177, 201 (Cal. 2007); *see also Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003) (holding that counsel's failure to present expert testimony explaining a possible causal link between defendant's childhood and his crime was prejudicial). Therefore, the testimony from Dr. Vicary would not be cumulative, but instead highly probative in understanding the effect of Cunningham's childhood abuse and mental illness on his crimes.

**2. There is no evidence in the record that we may consider to conclude that Dr. Vicary's testimony would have "opened the door to rebuttal."**

The majority concludes that even if Dr. Vicary had presented evidence of Cunningham's depressive mental illness, such testimony "would have opened the door to rebuttal by a state expert."

As both parties concede in their supplemental briefs, pursuant to *Pinholster* this court can now consider only the evidence that was before the California Supreme Court, including exhibits, declarations, deposition transcripts, and evidentiary hearing testimony first introduced in the district court habeas proceedings. The majority itself recognized that, "we may not consider evidence raised for the first time during the district court's evidentiary hearing." The decision in this court must "rest[] solely on the record before the state court."

The California Supreme Court was only presented with Dr. Vicary's report and his additional declaration. As described above, Dr. Vicary's report would not have been duplicative and would have provided valuable insight from a medical perspective to help aid the jury in its weighty decision whether to sentence Cunningham to death. As the Supreme Court recently explained, even where a state expert undermines a defense expert's conclusions, "it [is] not reasonable to discount entirely the effect that [the expert's] testimony might have had on the jury." *Porter v. McCullom*, 130 S. Ct. 447, 455 (2009) (per curiam).

### 3. It was prejudicial to exclude Dr. Vicary's statements.

Even through the "deferential lens of § 2254(d)," there is a reasonable probability that the testimony could have changed at least one juror's decision. *See Pinholster*, 131 S. Ct. at 1403.

Dr. Vicary's testimony would not only have provided insight on Cunningham's condition at trial, but it would have also helped explain Cunningham's past behavior and culpability. The Supreme Court has recognized the importance of evidence regarding the defendant's limited mental capacity for mitigation purposes. *Smith v. Texas*, 543 U.S. 37, 45 (2004); *see also Penry v. Lynugh*, 492 U.S. 302, 319 (1989) ("evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse").

In addition, under California Penal Code § 190.3, California jurors *must* consider specific factors in determining whether to sentence a defendant to death, including mental health factors. In Cunningham's case, three of the eleven factors jurors were instructed to consider directly related to Cunningham's mental health: 1) "whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance"; 2) whether "at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct *or to conform his conduct to the requirements of law was impaired as a result*

*of mental disease or defect* or the effects of intoxication"; and 3) a "catch-all" factor, which required the jury to consider:

> Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any other sympathetic or other aspect of the defendant's character or record [that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle].

Thus, it became crucial to have an expert corroborate Cunningham's own testimony that he suffered from a traumatic childhood and some type of mental illness. *See Thomas v. Chappell*, 678 F.3d 1086, 1105 (2012) (holding that the failure of defense counsel to call a corroborating witness resulted in prejudice to the defendant).

Dr. Vicary noted that as a result of Cunningham's "chronic underlying depressive mental illness," Cunningham had difficulty controlling his impulses, had aggressive outbursts, and engaged in self-destructive acts. Significantly, Dr. Vicary noted that alcohol was a "major exacerbating factor." On the night of Treto's murder, evidence indicates that Cunningham drank at multiple bars. Additionally, evidence exists that Cunningham was under the influence of alcohol during the murder of Ella Mae Fellows. Accordingly, Dr. Vicary's testimony would have significantly aided the jury in highlighting Cunningham's mental problems, which

may have rendered Cunningham less culpable in the eyes of at least one juror.

The majority relies on *Pinholster* as instructive, but certain factual differences between *Pinholster* and this case allow for a more favorable finding for prejudice in this case. In *Pinholster*, the defendant's attorneys failed to call any witness other than the defendant's mother to testify at the penalty phase of his capital case.    131 S. Ct. at 1396. Pinholster's attorney had previously consulted psychiatrist Dr. John Stalberg who noted Pinholster's "psychopathic personality traits," diagnosed him with antisocial personality disorder, and concluded that he "was not under the influence of extreme mental or emotional disturbance" at the time of the murders.  *Id.*  In his state habeas petition, Pinholster argued that his attorney was ineffective at the penalty phase of his trial.  He submitted a declaration of psychiatrist Dr. George Woods who diagnosed Pinholster with bipolar mood disorder and seizure disorders.  *Id.*  Pinholster also included a declaration from Dr. Stalberg who stated that Pinholster's attorney only provided him with some police reports and a 1978 probation report.  *Id.*  Dr. Stalberg testified that had he known about the additional material, he would have conducted "further inquiry" before concluding that Pinholster suffered only from a personality disorder.  *Id.*  Dr. Stalberg did not, however, retract his earlier diagnosis.

Pinholster reveled in his criminal history, bragging about being a "professional robber" and explaining that his occupation was that of a "crook."  *Id.* at 1408, 1405.  He also testified that he was a white supremacist and that he frequently carved swastikas into other people's property as "a sideline to a robbery."  *Id.*  The state presented evidence during the penalty phase that Pinholster had threatened to kill

the State's lead witness, assaulted a man with a straight razor, and kidnapped another person with a knife. *Id.* at 1408. The Supreme Court ultimately concluded that there was no prejudice in failing to call Dr. Stalberg because there was "no reasonable probability that the additional evidence Pinholster presented in his state habeas proceedings would have changed the jury's verdict." *Id.* at 1408–09.

This case presents a closer call than *Pinholster*. First, unlike *Pinholster*, the State in this case possessed less aggravating evidence pertaining to Cunningham. Although the State described Cunningham's previous crimes, including second degree murder, sodomy, and an assault on a police officer, Cunningham did not display the same callous lack of remorse or desire for crime as Pinholster. Second, Dr. Vicary would not only have discussed a social disorder, but would have also explained that Cunningham suffered from "chronic depressive mental illness" for which alcoholism was a "major exacerbating factor." This diagnosis would not only provide insight into the crime for which he was sentenced to death, but also explain Cunningham's mental state during his prior convictions. Finally, *Pinholster* did not concern the failure of counsel to present evidence that would directly address statutory mitigating factors that the jury was required to consider. For these reasons, Dr. Vicary's expert opinion about Cunningham's mental health could reasonably have caused at least one juror to strike a different balance.

## IV.  Conclusion

Because Cunningham's attorney failed to call Dr. Vicary, the jury lacked a significant piece of mitigating evidence when it decided to sentence Cunningham to death. Positive and negative factors "might cause a sentencer to determine

that a life sentence, rather than death at the hands of the state, is the appropriate punishment for the particular defendant." *Lambright v. Schriro*, 490 F.3d 1103, 1115 (9th Cir. 2007). The court must "'treat[ ] each defendant in a capital case with that degree of respect due [to] the uniqueness of the individual,' and determin[e] whether or not he is deserving of execution only after taking his unique life circumstances, disabilities, and traits into account, [as] is constitutionally required." *Id.* (quoting *Lockett v. Ohio*, 438 U.S. 586, 605 (1978)). As such, "the Constitution requires that 'the sentencer in capital cases must be permitted to consider any relevant mitigating factor.'" *Porter*, 130 S. Ct. at 454–55 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)).

In this case, a different result was substantially likely. *See Pinholster*, 131 S. Ct. at 1403. Cunningham has demonstrated there is a reasonable probability that at least one juror would have struck a different balance because of new evidence provided by Dr. Vicary showing Cunningham's less culpable mindset. Mitigating mental health evidence from a qualified expert witness holds strong weight in a death penalty sentencing. It should not be brushed off as easily as the majority has done.

Because Cunningham's counsel's deficiency deprived the sentencing jury the opportunity to weigh this substantial piece of mitigating evidence, the confidence of Cunningham's death sentence is sufficiently undermined. Cunningham was prejudiced and the California Supreme Court's contrary finding was an unreasonable application of *Strickland*.