**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAUL M. ZAPATA,
  *Petitioner-Appellant*,

v.

RODOLFO VASQUEZ,
  *Respondent-Appellee.*

No. 12-17503

D.C. No.
3:10-cv-00176-TEH

OPINION

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, Senior District Judge, Presiding

Argued and Submitted
September 11, 2014—San Francisco, California

Filed June 9, 2015

Before: Stephen Reinhardt, Raymond C. Fisher
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Fisher

## SUMMARY[*]

### Habeas Corpus

The panel reversed the district court's denial of a California state prisoner's habeas corpus petition challenging a conviction for first-degree murder with enhancements for committing an offense for the benefit of a criminal street gang and personally discharging a firearm in the course of the offense, and remanded with instructions to grant the petition.

The panel held that defense counsel's failure to object to the prosecutor's falsified inflammatory and ethnically charged remarks, delivered during closing argument moments before the jury was sent to deliberate the case, constituted ineffective assistance of counsel. The California Court of Appeal's failure to so conclude was based on an unreasonable factual determination and was an unreasonable application of controlling Supreme Court law.

### COUNSEL

Steven G. Kalar, Federal Public Defender for the Northern District of California; Robert M. Carlin (argued), Assistant Federal Public Defender; Mara K. Goldman, Research and Writing Attorney, San Jose, California, for Petitioner-Appellant.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Kamala D. Harris, Attorney General of California; Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Peggy S. Ruffra, Supervising Deputy Attorney General, John H. Deist (argued), Deputy Attorney General, San Francisco, California, for Respondent-Appellee.

## OPINION

FISHER, Circuit Judge:

In 2004, a jury convicted Paul Zapata of first-degree murder in violation of California Penal Code § 187, along with enhancements for committing an offense for the benefit of a criminal street gang and personally discharging a firearm in the course of the offense. He was sentenced to two consecutive terms of 25 years to life in prison. He appealed to the California Court of Appeal, which denied relief in a reasoned opinion, and to the California Supreme Court, which denied review. Having exhausted those avenues, he filed a habeas corpus petition in federal district court, which the court denied. He appeals that denial, arguing in part that his trial counsel's failure to object to egregious prosecutorial misconduct during closing argument constituted ineffective assistance of counsel substantially affecting the outcome of his trial. We agree, and reverse the district court and remand the case with instructions to grant Zapata's habeas petition.

## BACKGROUND

In May 2001, shortly after placing a call on a pay phone, a 19-year-old student named Juan Trigueros was shot and killed in a 7-Eleven parking lot on Leavesley Road in Gilroy,

California. At the time of the shooting, which took place around 2 a.m., Trigueros was wearing a basketball jersey emblazoned with the number 8, for Los Angeles Lakers star Kobe Bryant. The area in which the shooting took place was controlled by the Norteños street gang, of which there were several subgroups, or "cliques."[1] One such clique, of which Zapata was a member, was Outside Posse, or "OSP." As an OSP member, Zapata had participated in attacks on Eighth Street gang members and Mexican nationals.

The Norteños' rivals were a subset of the Sureños street gang known as Eighth Street, whose identifying symbol was the number 8. Sureños tended to be first-generation Mexican immigrants who spoke limited English, whereas Norteños tended to be established U.S. residents who spoke English rather than Spanish. According to an expert on gang activity in the area, by wearing the number 8 in Norteño territory, Trigueros, a first-generation Mexican immigrant, was a "marked man." There was no evidence Trigueros was affiliated with the Sureños.

The only eyewitness to the shooting, Brian Puphal, testified that he observed one man "[f]acing the pay phone trying to concentrate on whatever he was talking about" and a second man, about two or three feet away, "[r]aising his arms in anger" and yelling at the person on the phone. Puphal saw the man who was yelling draw a pistol from his waistband and fire a shot at the man who was on the phone, from two or three feet away, and then fire a second shot from about six feet away. The man who was on the phone – later identified as Trigueros – stumbled into the 7-Eleven, where

---

[1] The prosecution's expert on Gilroy gangs, Officer Geoff Guerin, referred to the Norteño gang subgroups as "cliques."

he died.  Puphal saw the shooter run away through a nearby car wash and, soon thereafter, saw a white pickup truck drive slowly past the 7-Eleven.  Puphal described the shooter to a police sketch artist, noting he was "sure" the killer had a "scraggly goatee."  He was not, however, able to identify anyone as the shooter when shown two photographic lineups, one of which included a photograph of Zapata.  At trial, Puphal was shown a June 2001 photograph of Zapata and testified that the person depicted in the photo "[c]ould be" the shooter.  In a pretrial statement, Puphal described the shooter as being 5'5", but at trial he recalled the shooter being "somewhere around" 5'5" to 5'8" tall.

A second witness, Joe Morton, had been working at the neighboring Shell gas station when he heard gunshots, went outside, and saw a man he described as "nonchalantly walking" from the direction of the 7-Eleven before getting into a white Ford pickup truck.  Morton described the man as being between 5'10" and 6' tall.

A third witness, Felipe Davila, testified that he was shopping at the 7-Eleven when he heard "screeching" and ran outside to see a white truck being driven in a "wild" manner and sustain damage after hitting a traffic island.  He testified that he was "positive" the vehicle was a Toyota, and a month before trial, he identified Zapata's white Toyota pickup truck, with damage, as the one that he saw that night.

Zapata's ex-girlfriend, Nancy Echeverria, testified that she and Zapata had attended a barbeque at an OSP member's home a few blocks from the 7-Eleven in the hours before Trigueros' murder.  She said Zapata left between 10 and 11 p.m. to drive a friend to work.  In November 2002, 18 months after the murder, Echeverria placed a call to a police tip line

and told Detective Daniel Zen she suspected Zapata had committed the crime. In an interview with Detective Zen, Echeverria said she thought Zapata was the killer because the police sketch looked like him and his truck had disappeared the following morning. At trial, however, Echeverria testified that she saw Zapata driving his truck the day after the shooting, and that she had overstated the degree of resemblance between Zapata and the police sketch. She also testified that she had been motivated to call the tip line because Zapata had broken up with her and she wanted to "burn" him and his new girlfriend "in a big way."

Another witness, Sarah Sanchez, the ex-girlfriend of an OSP member, testified that shortly after the shooting, in May or early June 2001, she saw Zapata when she was driving an OSP member named Donald Reyes to the "Ramirez ranch," the home of mutual friends in Gilroy.[2] According to Sanchez, Zapata asked her to drive his truck to Stockton or Manteca; when she asked why, Zapata said he had "shot up somebody at 7-Eleven."

Victoria Lopez, who was dating Zapata's close friend, Edward Lopez, at the time of the murder, told Detective Zen in a 2002 interview that Zapata drove a white pickup truck in the spring of 2001 but began to drive a black Taurus shortly after the shooting in May 2001. She said Edward told her Zapata's truck was "broke[n] down" and being stored at the Stockton home of Rico Clarke, a former OSP associate. At trial, however, Lopez testified she thought Zapata drove the

---

[2] Specifically, Sanchez testified she saw Zapata between two days and a week before she read about the 7-Eleven murder and saw the composite sketch in the newspaper. During cross-examination, she explained that she read this newspaper article in late May or early June.

truck "sometime after" May 2001 until he got a black car and could not recall the rest of her pretrial statement.

Detective Zen testified that in December 2002, Echeverria told him Zapata's truck was located at the home of Priscilla Pena, Zapata's new girlfriend. Zen located the truck there, but it was gone a few months later. Zen eventually located the truck at Pena's sister's house and seized it in March 2003.

The defense called a handful of witnesses, including Pena; Zapata's uncle, Rocky Reyes; and Zapata's cousin, Donald Reyes. All of these witnesses said Zapata was incapable of growing a goatee, countering Puphal's description of the shooter as having a goatee. They also testified that Zapata continued to drive the white pickup truck well into the summer of 2001, long after the Trigueros shooting.

At trial, the state was represented by Stuart Scott, a Santa Clara County Deputy District Attorney. In closing, Scott argued that Zapata had previously been involved in attacks on Eighth Street gang members and Mexican nationals and that the similarity between his likeness and Puphal's description of the perpetrator, disappearance of his white pickup truck and confession to Sarah Sanchez compelled a finding of guilt. The defense countered that the prosecution had been unable to link Zapata conclusively to the scene of the crime either through positive eyewitness identification or physical evidence and emphasized bias and credibility problems with several of the prosecution's witnesses.

Critical to the issue before us, at the end of the trial during the prosecution's closing rebuttal argument, Scott wove out of whole cloth, with no evidentiary support, a fictional and

highly emotional account of the last words Trigueros heard Zapata shout as Zapata supposedly shot him.  The prosecutor ascribed to Zapata several despicable, inflammatory ethnic slurs:

> Picture, if you will, the last words that Juan Trigueros heard before the defendant shot him in the back and to make sure he was dead shot him in the chest.  What were the last things he heard?  What's the reasonable inference of what was going on that precise moment the second before he's mortally wounded?  Fuckin' scrap.  You fuckin' wetback.  Can you imagine the terror and the fear Juan Trigueros must have felt as he's cowering into the phone. . . . Fuckin' scrap. Wetback.

The prosecutor repeated these inflammatory remarks twice more, including just before the jury retired to begin deliberations.

These slurs were invoked deliberately.  In his opening statement, the prosecutor had told the jury the word "scrap" is "a derogatory term – it's like using the N word – for Mexican nationals.  It's very derogatory.  Mojado [wetback] is another derogatory term."  The prosecution's expert witness testified "scrap" means "piece of shit," and that although Mexican nationals "might not realize exactly what it means as far as the significance of it . . . it's taken as an insult" and would be "fighting words" to a Sureño gang member.

Zapata's counsel neither objected to the fictional, inflammatory statements in the closing argument nor asked the trial court to issue a curative instruction. The jury was then sent to deliberate. After three hours, it found Zapata guilty of first-degree murder.

In January 2009, the California Court of Appeal affirmed Zapata's murder conviction. The California Supreme Court denied review. Zapata next petitioned the federal district court for habeas relief in January 2010. The district court denied his petition but granted a limited certificate of appealability. Zapata timely appealed the district court's judgment.

## STANDARD OF REVIEW

We review de novo the district court's denial of Zapata's § 2254 habeas petition. *See Hurles v. Ryan*, 752 F.3d 768, 777 (9th Cir. 2014). Because this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), habeas relief can be granted only if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States" or resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

## DISCUSSION

Zapata argues the prosecutor's inflammatory, fabricated and ethnically charged comments constituted prosecutorial misconduct and that his counsel provided ineffective

assistance by failing to object to them. Although we cannot reach the prosecutorial misconduct claim because it is procedurally defaulted, we agree that counsel's failure to insulate the jury from the prosecutor's grossly improper comments constituted ineffective assistance.[3]

## I.  Procedural default of prosecutorial misconduct claim

Zapata first argues the prosecutor's comments constituted misconduct. Because the state court reviewed the merits of the direct prosecutorial misconduct claim, he contends, we may as well.  "If a state appellate court overlooks the procedural default and considers an objection on the merits, the state has not relied on the procedural bar and the federal courts may review the claim." *Thomas v. Hubbard*, 273 F.3d 1164, 1176 (9th Cir. 2001), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002) (en banc). "[U]nless a [state] court expressly (not implicitly) states that it is relying upon a procedural bar, we must construe an ambiguous state court response as acting on the merits of a claim, if such a construction is plausible."  *Chambers v. McDaniel*, 549 F.3d 1191, 1197 (9th Cir. 2008).

Here, the state court expressly invoked a procedural bar in addressing Zapata's prosecutorial misconduct claim, saying that "[d]ue to counsel's failure to object to these remarks, . . . the claim of prosecutorial error, as such, is not available on appeal." Although the court went on to discuss the merits of the claim, because it separately relied on the procedural bar, the claim is defaulted. *See Loveland v. Hatcher*, 231 F.3d 640, 643 (9th Cir. 2000) (holding that,

---

[3] Because we conclude that Zapata's petition should be granted on this basis, we do not reach his remaining claims.

when "reliance upon [the state court's] procedural bar rule was an independent and alternative basis for its denial of the petition, review on the merits of the petitioner's federal constitutional claim in federal court is precluded"). Moreover, Zapata does not seek to excuse his procedural default. We therefore cannot reach the claim on the merits, although the nature of the prosecutor's remarks remains relevant to Zapata's ineffective assistance claim.

## II. Ineffective assistance of counsel for failure to object to closing remarks

Zapata next argues his trial counsel was constitutionally ineffective for failing to object to the prosecutor's fabricated and inflammatory remarks. *See Trillo v. Biter*, 769 F.3d 995, 1002 (9th Cir. 2014) (analyzing instances of prosecutorial misconduct to which trial counsel did not object as ineffective assistance claims).[4] Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), Zapata must demonstrate both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. On habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Notwithstanding AEDPA's deferential standard of review, we conclude the state court

---

[4] Zapata has requested we expand the certificate of appealability (COA) to consider this claim, because the district court granted a COA only on the direct prosecutorial misconduct claim. The government states that it has "address[ed] the claim indirectly by showing that there was either no prosecutorial misconduct or possibility of prejudice." We therefore grant Zapata's request to expand the COA pursuant to Ninth Circuit Rule 22-1(e). *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Notably, the district court addressed Zapata's claim as an ineffective assistance claim rather than as a direct prosecutorial misconduct claim.

unreasonably determined that Zapata's counsel was not deficient in failing to object to the prosecutor's inflammatory remarks on rebuttal and that Zapata was not prejudiced as a consequence.

### A. Deficient performance

We first consider whether Zapata's counsel performed deficiently by failing to object to the prosecutor's remarks. To do so, we must determine whether the prosecutor's remarks constituted objectionable misconduct. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (explaining that the merits of the underlying claim "control the resolution of the *Strickland* claim because trial counsel cannot have been ineffective for failing to raise a meritless objection"). In this respect, our task is made easy because the California Court of Appeal itself concluded "the prosecutor committed serious misconduct."

During closing rebuttal, the prosecutor urged the jury to "[p]icture" the "last words that Juan Trigueros heard," and then uttered the following phrases: "Fucking scrap. Wetback. Imagine again the last words you hear before you leave this Earth." The prosecutor repeated the slurs several times, emphasizing the falsified story of the victim's final moments as a theme in his rebuttal:

> Picture, if you will, the last words that Juan Trigueros heard before the defendant shot him in the back and to make sure he was dead shot him in the chest. What were the last things he heard? What's the reasonable inference of what was going on in that precise moment the second before he's mortally wounded?

Fuckin' scrap. You fuckin' wetback. Can you imagine the terror and the fear . . . Juan Trigueros must have felt as he's cowering into the phone as Puphal told you kind of bending into the phone to try [to] avoid this person, to not have any issue, to just try [to] get home and lead his life. Fuckin' scrap. Wetback. He died because he was born in Mexico and he made the mistake of wearing a number 8 jersey on Leavesley Avenue in the city of Gilroy and made the mistake of being at 7-Eleven the same night the defendant was partying five blocks away. What a way to exit this world.

. . . .

Wearing that number 8 Lakers jersey. Wrong place at the wrong time. Desperate. Fucking scrap. Wetback. Imagine again the last words you hear before you leave this Earth. . . .

. . . .

[Zapata] chose this [gang] lifestyle. Juan Trigueros didn't choose it. Try to remember those last words. Fuckin' scrap. Wetback. And in a few seconds he's left this Earth at the age of 19 years old. Juan Trigueros.

In addition, the prosecutor entreated the jurors to "use your God-given common sense, and do the correct thing in this case which is to bring this man to justice. If you can't

bring Juan Trigueros back, this is the next best thing. Do the right thing, Ladies and Gentlemen. Please, I implore you."

The state court, noting the prosecutor's improper argument was "the most troubling" of the issues Zapata raised on direct appeal, cogently explained why the prosecutorial remarks, which it labeled "pure fiction," amounted to "serious misconduct":

> [T]he suggestion that the killer was shouting ethnic epithets was wholly speculative. The only eyewitness to the actual shooting, Brian Puphal, was able to say only that the killer was shouting and gesticulating at the victim, who was cowering into the phone booth. Some basis for the prosecutor's speculation could be found in the facts that defendant and some of his OSP companions possessed a demonstrated animosity toward Mexican nationals, and that to wear number 8 in the neighborhood of the shooting would furnish a particular stimulus for any OSP member to inflict violence upon the wearer's person. But while this chain of inferences could furnish a motive for the shooting and elements such as intent and premeditation, it was pure fiction to suppose that it also established what was actually being said at the time of the shooting.
>
> More critically, the fiction thus spun by the prosecutor was both inflammatory and wholly extraneous to any issue properly before the jury. . . . The prosecutor could have no reason for mentioning it other than to inflame the

jury's sentiments. There was simply no occasion for the jury to contemplate the victim's subjective experience at the time of his murder, even if there had been an evidentiary basis to do so. By deliberately drawing the jury's attention to that irrelevant and improper consideration, the prosecutor committed serious misconduct.

The court's conclusion that the prosecutor committed serious misconduct was entirely correct. *See Darden v. Wainwright*, 477 U.S. 168, 180–81 (1986) (observing that inflammatory and misleading argument is improper). In a similar context, we held that a prosecutor commits misconduct by recounting the crime from the victim's perspective during closing argument:

[T]he prosecutor engaged in misconduct when he delivered a soliloquy in the voice of the victim. By doing so, the [p]rosecutor inappropriately obscured the fact that his role is to vindicate the public's interest in punishing crime, not to exact revenge on behalf of an individual victim. Furthermore, the prosecutor seriously risked manipulating and misstating the evidence by creating a fictitious character based on the dead victim and by "testifying" in the voice of the character as if he had been a percipient witness. Finally, by testifying as [the victim], the prosecutor also risked improperly inflaming the passions of the jury through his first-person appeal to its sympathies for the victim who, in the words of the prosecutor,

> was a gentle man who did nothing to deserve
> his dismal fate.

*Drayden v. White*, 232 F.3d 704, 712–13 (9th Cir. 2000).**[5]**

Those same concerns exist here. First, by urging the jurors to base their decision on an experience of the victim the state court labeled "pure fiction," the prosecutor improperly encouraged them to convict Zapata out of sympathy for Trigueros and animus towards the killer. Second, by falsely saying the victim heard hateful ethnic slurs in the moments before his death, the prosecutor manipulated and misstated the evidence. As the state court explained, the only eyewitness to the murder, Brian Puphal, testified that he could not hear what the killer was yelling in the moments before Trigueros' death. Yet the prosecutor presented this fictional scenario as though it was fact. And just before concluding his rebuttal argument, he invited the jurors to "remember those last words" Trigueros heard as though Zapata had uttered them. The fabrication was especially pernicious because of the extensive evidence of Zapata's gang-related criminal history. By concocting the details of the victim's dying experience in this manner, the prosecutor

---

**[5]** Although *Drayden* is a pre-AEDPA case, *see* 232 F.3d at 708, it applied clearly established Supreme Court precedent – specifically, *Darden*, 477 U.S. 168, and *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) – to analyze the prejudicial effect of prosecutorial misconduct, *see id.* at 713–14; *see also Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) ("The 'clearly established Federal law' relevant here is our decision in *Darden v. Wainwright*, which explained that a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (citation omitted)).

purposefully blurred the distinction between Zapata's past convictions and the crime for which he was standing trial.[6]

Finally, the statements were improperly designed to appeal to the passions of the jury. That the slurs were directed at a specific ethnic group particularly risked sparking visceral outrage among members of the jury and encouraged them to convict based on emotion rather than evidence.[7] *Cf.*

---

[6] Nor can the prosecutor's statements be characterized as reasonable inferences that could be drawn from the evidence. Although there was evidence that OSP members had shouted these words in an unrelated attack that occurred seven weeks after the Trigueros shooting, there was not a shred of evidence in the record that the shooter uttered these words to Trigueros. Although a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). Such "foul blows" include spinning a fiction and presenting it as the truth to the jury in a closing summation.

[7] Racial and ethnic slurs incite particular offense and outrage in the listener. As one scholar has observed:

> uses of slurs . . . are offensive simply because they sometimes constitute violations on their very prohibition. Just as whoever violates a prohibition risks offending those who respect it, perhaps the fact that slurs are prohibited explains why we cannot escape the affect, hatred and negative association tied to them . . . . Prohibited words are usually banished wherever they occur. This explains why bystanders (even when silent) are uncomfortable, often embarrassed, when confronted by a slur. Whatever offenses these confrontations exact, the audience risks complicity, as if the offense were thrust upon them, not because of its content, but because of a responsibility we all incur in ensuring certain violations are prevented; when they are not, they must be reported and possibly punished. Their occurrences taint us all.

*McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987) (noting "[t]he Constitution prohibits racially biased prosecutorial arguments" (citing *Donnelly*, 416 U.S. at 643)).  The prosecutor's remarks here plainly constituted objectionable and serious misconduct, as the California Court of Appeal concluded.

Nonetheless, the court stopped short of holding that trial counsel performed deficiently by failing to object:

> [T]he record does not affirmatively suggest any tactical reason for the lack of objection. It is nonetheless conceivable that counsel had such a reason.  Where jury argument is concerned, it is always conceivable – if barely – that something in the tone of the challenged remarks leads counsel to believe they may backfire.  This possibility may seem especially remote here, where the prosecutor appears to have presented the case with considerable competence and skill.  The same may be said, however, of defense counsel. We are simply unable to say on this cold record that there could be no conceivable tactical reason for the latter's acquiescence in the former's improper jury arguments.

That conclusion is unreasonable, particularly given the seriousness of the prosecutorial misconduct that the state court itself articulated so powerfully.

---

Ernie Lepore, *Speech and Harm*, N.Y. Times, Nov. 7, 2010, *available at* http://opinionator.blogs.nytimes.com/2010/11/07/speech-and-harm/ (last visited May 20, 2015).

On habeas review, we accord deference both to trial counsel's failure to object and to the state court's conclusion that such failure was reasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (acknowledging review is "doubly deferential when it is conducted through the lens of federal habeas"). We consider whether "it would have been reasonable to reject [Zapata's] allegation of deficient performance for any of the reasons expressed by the court of appeal." *Cannedy v. Adams*, 706 F.3d 1148, 1159 (9th Cir. 2013). "Because of the difficulties inherent in making the evaluation, [we] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [Zapata] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Tilcock v. Budge*, 538 F.3d 1138, 1146 (9th Cir. 2008) (quoting *Strickland*, 466 U.S. at 689).

Although "[t]he right to effective assistance extends to closing arguments," *Yarborough*, 540 U.S. at 5, failure to object during a closing summation generally does not constitute deficient performance. "[A]bsent egregious misstatements, the failure to object during closing argument and opening statement is within the wide range of permissible professional legal conduct." *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (internal quotation marks omitted). Here, however, the remarks – fabricated from whole cloth, designed to inflame the passions of the jury and delivered in the waning moments of trial – unquestionably were "egregious misstatements." Even if the first such remark could have "backfire[d]," as the state court hypothesized, a timely objection would have curtailed its repetition. Instead, trial counsel's silence, and the judge's consequent failure to intervene, may have been perceived by

the jury as acquiescence in the truth of the imagined scene – or at least, in the validity of such speculation about the victim's last minutes.**[8]**

Especially significant is the timing of the comments, which were made during rebuttal after defense counsel's last opportunity to address the jury. The prosecutor repeated the slurs toward the very end of his closing rebuttal; after urging the jurors to "[t]ry to remember those last words. Fuckin' scrap. Wetback," he declared, "I'm pretty much done." By reserving the remarks for rebuttal, the prosecution insulated them from direct challenge. As a result, the only way Zapata's trial counsel could have challenged the misstatements would have been to object and request a curative instruction.

Defense counsel's failure to object to this egregious misconduct therefore "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The state court's conclusion that "it is always conceivable" that trial counsel might have a reason not to object to improper jury argument – even where, as here, it was falsified, inflammatory and delivered immediately before the jury was sent to deliberate Zapata's fate – contravenes the Supreme Court's admonition that "courts may not indulge *post hoc* rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Harrington*, 562 U.S. at 108 (internal quotation marks omitted); *see also Wiggins v. Smith*, 539 U.S. 510, 526–27 (2003) (rejecting a state court's attempt to rationalize counsel's limited investigation into mitigating evidence as a strategic decision

---

**[8]** Indeed, during the defense closing, the prosecutor did not hesitate to object to potentially improper statements by defense counsel.

when available evidence suggested counsel's conduct stemmed from "inattention, not reasoned strategic judgment")).   Moreover, by stating that "it is always conceivable" that the "tone" of the challenged remarks provides a reason not to object, the state court effectively eliminated the possibility of ever finding ineffectiveness of counsel for failing to object during closing summation, no matter how egregious the argument.

Here, the record suggests "nothing strategic about failing to object" to patent, inflammatory and repeated misconduct. *Tilcock*, 538 F.3d at 1146; *cf. United States v. Sanchez*, 659 F.3d 1252, 1258 (9th Cir. 2011) (noting defense counsel should have objected to the prosecutor's improper rebuttal so the district court could issue a "strongly worded curative instruction").  The state court's determination that Zapata's attorney did not perform deficiently plainly was objectively unreasonable under § 2254(d)(1).

### B.  Prejudice

We therefore turn to the state court's conclusion that Zapata was not prejudiced by the prosecution's unchallenged argument.  To establish prejudice under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable."  *Harrington*, 562 U.S. at 112.  On habeas review, "[i]nstead of considering whether [Zapata] met the burden of proving prejudice, we must decide whether the state post-conviction court was reasonable in determining that [he] was not prejudiced."  *Vega v. Ryan*, 757 F.3d 960, 969 (9th Cir. 2014) (internal quotation marks omitted).  In other words, under AEDPA, Zapata is entitled to relief only if the state court's prejudice analysis was contrary to, or an unreasonable application of, *Strickland*'s prejudice prong, *see*

28 U.S.C. § 2254(d)(1); or if the state court's prejudice analysis "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). We "must uphold the state court's decision if 'fairminded jurists could disagree' as to whether it was correct." *Gulbrandson v. Ryan*, 738 F.3d 976, 990 (9th Cir. 2013) (quoting *Harrington*, 562 U.S. at 88). Here, the totality of the circumstances shows the California Court of Appeal's prejudice determination was unreasonable.

### 1. The evidence of guilt was weak, and the state court's contrary conclusion rested on multiple unreasonable determinations of the facts.

Although the state court acknowledged that "the prosecution case was hampered by weaknesses in the identification evidence," it nevertheless concluded it was "highly unlikely that the jury was influenced by the prosecutor's improper argument as opposed to the other strong evidence of [Zapata's] guilt." The "strong evidence" the court cited included these "facts":

(1) "the universe of likely perpetrators was effectively confined to OSP members by the absence of any explanation for the crime other than gang-related hatred";

(2) the similarities between Zapata's likeness and the police sketch meant "the gunman was either [Zapata] or another OSP member who also happened to resemble the sketch"; and

(3) "[t]he involvement of [Zapata]'s pickup in the shooting, which the defense did not seriously contest, made

it extremely likely that he was either the gunman or the driver."

The court concluded that "[t]hese facts, which do not depend on the credibility of any witness who had an arguable motive to lie, pointed strongly to [Zapata] as the actual killer."

The record does not support the court's characterization of this evidence, and its ultimate prejudice determination regarding the facts was unreasonable on the actual record. The state court's first observation is demonstrably an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). Because OSP was just one of many active Norteño gangs in the Gilroy area, the universe of perpetrators was not "confined to OSP members" – it was significantly broader than the state court assumed. The prosecution's gang expert, Officer Guerin, testified that there were "several cliques of Norteño gangs" active in the area, including OSP, East Side Gilas, Firme Mafia, Family Unity and the Brown Pride Kings, and "some other smaller ones." He further testified that "any person from a Norteño gang" would have viewed a member of Calle Ocho ("Eighth Street") as the enemy and thus would have harbored animosity towards someone wearing a number 8 jersey like the one Juan Trigueros had on. Guerin noted the "biggest . . . two" gangs were the East Side Gilas and OSP, both of which had been particularly active the summer of Trigueros' shooting. When asked why a man wearing a number 8 jersey would be targeted, Guerin said:

> 8 is common – is an identifying number for all
> our Sureño gangs in Gilroy . . . . So it's
> significant in that in my opinion . . . *if any*

*Norteño gang member* including someone
from OSP sees someone . . . who[m] they
perceived to be a possible gang member or a
Sureño gang member wearing a jersey with
the number 8 it could help better their
perception as to that person being from and a
member of the Eighth Street Sureño gang.

The prosecutor questioned Guerin about the significance
of the area where Trigueros was stranded:

Q: That particular area down Leavesley past
the 7-Eleven where our shooting took place
. . . is that an area that is more Norteño
controlled or Sureño controlled?

A: It would be more – *we see more activity of
Norteño gang members* in that area.

Q: Is that an area where if an Eighth Street
gang member would appear or try to loiter or
hang out he would be someone possibly
challenged by a Norteño gang member?

A: Correct. . . . [That area is] highly traversed
by everyone in town and most importantly
*Norteño gang members*.

Guerin further explained:

7-Eleven on Leavesley – Leavesley is a main
road in Gilroy – is *predominantly a Norteño-
controlled area. Many Norteño gang*

*members* live in the immediate area . . . *so I consider that area a Norteño gang area.*

And a Sureño gang member going into that area, whether it's the 7-Eleven store, the Rotten Robbie's gas station or the gas station across the street . . . those are *all areas where Norteños frequent.* And if a Sureño comes into that area they're going to – if they come across *Norteño gang members* they're going to be looked upon as not being in the proper area for that – for a Sureño gang member.

Given this uncontradicted evidence, the state court unreasonably assumed that the shooter had to be an OSP member.[9] Guerin's testimony establishes that *all* Norteño gangs frequented the area near the 7-Eleven and that any one of them would have viewed a man wearing the number 8 with animosity. Even factoring in Guerin's testimony that OSP and another large Norteño gang, East Side Gilas, were particularly active in the summer of 2001, the universe of potential gunmen was still significantly broader than a single Norteño "clique." If the potential shooter could just as likely have been a member of the East Side Gilas, another major Norteño subgroup, let alone any one of the many other

---

[9] The state court's misunderstanding regarding the universe of potential shooters is reflected elsewhere in its opinion. The court wrote: "An expert testified that the neighborhood in which he had stranded himself was claimed as turf by Outside Posse (OSP), a local clique of the Norteños street gang." The gang expert's testimony establishes the area was generally claimed as *Norteño* turf, not specifically *OSP* turf. The gang expert testified that "[w]e have several cliques of Norteño gangs," including OSP, and that the area surrounding the 7-Eleven was "predominantly a Norteño-controlled area."

Norteño subgroups in Gilroy, then the mere fact of Zapata's OSP membership was less probative of his guilt.

Second, and for the same reason, the court's second assumption – that the similarities between Zapata's face and the police sketch meant that the shooter had to be an OSP member who resembled Zapata – also constitutes an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). Again, according to the prosecution's own expert witness, OSP was just one of many Norteño subgroups whose members frequented the area near the 7-Eleven, so the state court's belief that the shooter could only have been an OSP member resembling the sketch was unreasonable.[10]

Third, the court's statement that the involvement of Zapata's white Toyota pickup truck in the shooting was never seriously contested is also directly contradicted by the record. Defense counsel not only cross-examined the prosecution's witnesses on their vehicle identification testimony, but also explicitly highlighted the conflicts and inconsistencies in that testimony during his closing argument.

As Zapata's attorney emphasized at trial, the state's witnesses disagreed on the make and the type of vehicle involved in the shooting. Morton, who testified that he had "be[en] in automotive all [his] life," said the vehicle was a

---

[10] Moreover, there was disagreement at trial about the degree to which Zapata actually resembled the sketch. When asked to compare his sketch against a contemporaneous photo of Zapata, the police sketch artist could say only that there was "some likeness." Puphal, whose description formed the basis of the sketch, was never able to identify Zapata in a photo lineup. And Echeverria, who initially said the sketch looked "just like" Zapata, testified at trial that she had purposely overstated the degree to which the sketch resembled Zapata.

Ford truck or an SUV with a topper. Puphal testified the truck was a single cab white pickup; at trial, when shown a photograph of Zapata's truck, he said only that it "could be" the one involved in the shooting. Although Davila testified that the truck was a Toyota, it was only a month before trial, and over three years after the murder, that he identified Zapata's truck as the one involved in the shooting. In sum, the defense vigorously argued this point and created enough uncertainty to give at least some jurors reason to doubt whether the getaway car was Zapata's white pickup.[11] The

---

[11] Defense counsel attacked the vehicle identification testimony in closing summation, arguing:

> Sergeant Davila gave us testimony that's inconsistent and irreconcilable with the testimony of Brian Puphal and inconsistent and irreconcilable with the testimony [of] Joe Morton. Sergeant Davila is the only witness who comes into this courtroom and tells us he saw a Toyota pickup truck. Is that because he recalls seeing a Toyota pickup truck because he might have seen a photo of it when he met with Detective Zen? Or did it come up – or is it a recollection? Who knows where it came from. And why is – you know, that's just one piece of the problem. You know, you've got Joe Morton who tells you he's been in automotive all his life, he thinks it was a Ford, thinks it has a camper shell. We've got Brian who just knows it was a white truck, a four-by-four. And then here is the timing problem. . . . [Davila] says he sees somebody driving like a wild man and driving like a wild man I have in quotes. That was a wild man that no one else saw driving that night, that nobody else reports. He heard a screeching noise. A noise that nobody else heard. No one else reported. . . . Two people see a truck slowly moving progressing down Leavesley and then down Murray. Nobody heard the pealing [sic] of rubber, that screeching noise [Davila] talked about. And you'll

evidence about the truck was not only hotly disputed, but it fell short of establishing the vehicle at the shooting was Zapata's.  The state court's contrary determination that the involvement of Zapata's truck was "not seriously contested" misstated the record and was unreasonable as well.  Taken together, the foregoing three critical, but unfounded, factual assumptions were unreasonable and seriously undermine the state court's prejudice assessment.

In addition, the state court emphasized that a "guilty verdict was also strongly favored by the testimony and statements of the three witnesses attacked as 'the informants'[12] by the defense," particularly the "directly incriminat[ing]" testimony of Sarah Sanchez, who testified that Zapata told her he "shot up" the 7-Eleven.  In assessing the strength of this testimony, however, the court entirely

> recall [Davila] was in the gas station when he hears that noise.  He's in the gas station when he hears the two shots and shortly thereafter hears the screeching sound.  You know, sounds that nobody heard.  Joe Morton goes out and he told us on the Murray Street side of the Shell station in time to see what he thought was a white Ford pickup truck with a camper driving away.  No screeching, no laying of rubber on the pavement, no colliding with the median.  You know, it's – do I think [Davila] came into this courtroom and lied to you?  Absolutely not. . . . What you know of this case, the evidence that we have all seen and heard, was he wrong?  Absolutely.  But the prosecution embraces his testimony with the exception of the timing problem because he's the one person without a dog in this fight that recalls having seen a Toyota pickup truck.  You know, if it doesn't make sense you have to reject it.

[12] Zapata's counsel referred to Sarah Sanchez, Nancy Echeverria and Victoria Lopez as "the informants" in his closing argument.

overlooked a serious inconsistency in Sanchez's testimony and her resulting questionable credibility. *Cf. Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence."). Sanchez testified that in May or early June 2001, very shortly after the shooting, Zapata approached her while she was dropping off an OSP associate named Donald Reyes at the Ramirez ranch. She testified that Zapata asked if she could "do him a favor," and drive his truck to Stockton or Manteca because "he had shot up somebody at 7-Eleven." Donald Reyes, who testified for the defense, said he had never asked Sanchez for a ride and was incarcerated from April to the middle of June 2001, a fact to which the parties stipulated. Furthermore, as the state court did note, Sanchez also admitted at trial that she harbored ill will towards Zapata because, in November 2002, he and a group of OSP associates attacked her new boyfriend, presumably to send a message from her previous boyfriend, an OSP member. She did not contact the police about what Zapata purportedly told her until after that attack.

The testimony of Nancy Echeverria, Zapata's ex-girlfriend, was also subject to attack for bias. Echeverria, who was dating Zapata at the time of the Trigueros murder, testified at trial that she first suspected Zapata may have committed the murder after seeing the police sketch shortly afterward, but she called the police tip line only in December 2002, after Zapata had broken up with her and 18 months after the shooting. She testified at trial that she exaggerated the degree of resemblance between the police sketch and Zapata and lied about when she last saw the truck because she wanted to "burn" Zapata and his new girlfriend "in a big

way." Furthermore, she admitted she had not been entirely truthful in her pretrial conversations with Detective Zen about Zapata's involvement in the murder: "[N]ot everything I said was true, so it's kind of like, you know, I lied and I had to face reality."

Similarly, Victoria Lopez retreated at trial from her pretrial statement that she "kind of th[ought] it was stupid [Zapata]" who committed the murder because he began driving a black Taurus after May 2001. She testified that she continued to see Zapata drive the white pickup after May 2001 and that she could not remember the rest of her pretrial statement. The prosecution attempted to explain the inconsistencies by arguing Echeverria and Lopez had received threats from OSP members prior to trial, but the fact remained there were serious inconsistencies between their pretrial statements and in-court testimony.[13]

Considering these factors together, we conclude the California Court of Appeal's prejudice determination was based on multiple misapprehensions of the record, and its assessment of the strength of the evidence against Zapata was therefore unreasonable. First, its conclusion that the universe of perpetrators was limited to OSP members is contradicted by the testimony of the prosecution's own gang expert, who testified that OSP was just one of several active Norteño gangs in the area, and that members of any one of them would have viewed a perceived Sureño with animosity.

---

[13] Specifically, the prosecution presented evidence that Echeverria was afraid to testify because she had been intimidated by OSP members. Detective Zen testified Echeverria told him that she would lie if she was forced to testify in court. Echeverria, however, said she was afraid to testify because she had lied in her pretrial statements.

Second, its observation that the involvement of Zapata's truck in the shooting was never seriously contested is belied by the record; the state's witnesses could not agree on the type of vehicle involved in the shooting. Finally, the "directly incriminating" testimony of Sarah Sanchez was subject to attack for both credibility and bias, and the statements made by Echeverria and Lopez were also subject to viable credibility challenges.

In addition to the considerations explicitly mentioned by the state court, two additional foundations of the prosecution's case were weak at best. First, the prosecution argued Zapata's truck disappeared immediately following the Trigueros murder. There was, however, contradictory evidence about when the truck disappeared. In pretrial statements, Echeverria said the truck was "gone the next day, in the morning," and Lopez observed that Zapata began driving a black Taurus "right after" the murder and had stashed his truck at the Stockton home of Rico Clarke. At trial, however, Echeverria testified she saw Zapata driving the truck in Gilroy the day after the murder, in the afternoon, and Lopez testified she saw Zapata drive the truck "sometime after" the Trigueros shooting.[14] Clarke denied having kept

---

[14] Specifically, when questioned about when she last saw the truck, Lopez had the following exchange with the prosecutor:

> Q: Now did you ever see that white pickup truck after the shooting at the 7-Eleven on Leavesley in May 2001?
>
> A: Yeah, *I think he used to drive it afterwards*.
>
> Q: When?

the truck for Zapata, and Detective Zen testified that he did not see the truck at Clarke's house when he went to investigate in late 2002. In December 2002, Zen found the truck at an apartment complex in nearby Morgan Hill where Priscilla Pena, Zapata's new girlfriend, was living. In March 2003, Zen seized the truck from Pena's sister's house, also located in Morgan Hill.

There was also conflicting evidence about why the truck disappeared from Gilroy. Witnesses on both sides testified that Zapata's truck was a "piece of junk," in bad condition, and may have broken down. Multiple witnesses also testified

---

A: I – well, *sometime after May I guess* until he got a black car.

Q: Okay. Do you recall telling Dan Zen that as soon as it happened he didn't drive his truck no more. Do you remember telling Dan Zen that?

A: I remember it had broken down on the side of the freeway. . . .

Q: You never saw the truck the day after, the month after, six months after, a year after the 7-Eleven shooting, did you?

A: What do you mean?

Q: You never saw the truck after the shooting?

A: After that had happened?

Q: After you read it in the paper, correct.

A: No, because he had driven it afterwards but it had broken down. And after that – after that the car wasn't fixable . . . .

Zapata moved to Hollister sometime after the shooting and that the truck had been relocated there.

Second, the prosecution emphasized the similarity between Zapata's likeness and the eyewitness descriptions of the shooter. Puphal described the shooter to a police sketch artist shortly after the shooting as a "stocky" Hispanic man with a scraggly but "complete goatee" and beads around his neck, and Zapata had a tattoo on his neck. At trial, however, Puphal failed to positively identify Zapata in a photograph shown at trial, nor was he able to identify Zapata in a pretrial photographic lineup. Shortly after the shooting, in a police statement, Puphal described the shooter as being 5'5",[15] whereas Joe Morton, who heard the shots and saw a man fleeing the scene of the crime, testified he was sure the man had been between 5'10" and 6' tall. When asked if there was "[a]ny chance he was five seven," Morton responded, "No."

Furthermore, Echeverria told Detective Zen during a pretrial interview that the sketch looked "just like" Zapata when he was trying to grow a goatee. During cross-examination, however, she testified Zapata never had a goatee like the one pictured in the sketch and was incapable of growing one:

> Q: And you told the Court at that time that you told that lie because you didn't like [Zapata]. Is that the truth?

---

[15] At trial, Puphal initially testified during direct examination that the shooter was between 5'5" and 5'8", but when questioned on cross-examination, Puphal stated that the shooter was "approximately" 5'5".

> A: That's the truth. And when I had seen the sketch I figured, you know, if I say that he had a goatee or tried to grow one it was going to make it seem more like, you know, give – well, basically, that he was – it was just going to land on him that he did do it.

> Q: Well, it would make him look like the guy in the sketch.

> A: Correct.

Similarly, witnesses for both the prosecution and defense testified Zapata could not grow a goatee. Given Puphal's statement that the gunman "definitely" sported a goatee, this testimony further undercuts the degree to which Zapata matched the eyewitness description of the shooting.

In short, as the state court acknowledged, the prosecution's case was "hampered by weaknesses in the identification evidence." A careful reading of the record reveals that the case was even weaker than the state court believed it to be, sufficiently so that the court's conclusion that the jury was not influenced by the prosecutor's "serious," unchallenged misconduct was manifestly unreasonable. By contrast, in *Darden*, the Supreme Court concluded an improper prosecutorial argument was not prejudicial because "[t]he weight of the evidence against petitioner was heavy; the overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges reduced the likelihood that the jury's decision was influenced by argument." 477 U.S. at 182 (citation and internal quotation marks omitted)). Unlike in that case, here, the likelihood the jury's decision was influenced by the prosecutor's egregious

and inflammatory closing argument is heightened because the evidence against Zapata was weak, and the eyewitness and circumstantial evidence was far from overwhelming.

### 2. The prominence and timing of the comments also point to prejudice.

The prosecutor's inflammatory remarks were also prominent in the context of the entire trial. The prosecutor repeated the statements throughout the closing rebuttal, and they were among the last words the jurors heard before they were sent to deliberate. The presentation of improper material at the end of trial "magnifie[s]" its prejudicial effect because it is "freshest in the mind of the jury when [it] retire[s] to deliberate." *Crotts v. Smith*, 73 F.3d 861, 867 (9th Cir. 1996) (internal citation and quotation marks omitted), *superseded by statute on other grounds as stated in Van Tran v. Lindsey*, 212 F.3d 1143 (9th Cir. 2000); *see also Sanchez*, 659 F.3d at 1261 (observing that improper prosecutorial comment in a closing rebuttal was particularly problematic because "it was the last argument the jury heard before going to the jury room to deliberate," thus "increas[ing] the risk that the inflammatory statement would improperly influence the jurors").

### 3. The comments were not a reasonable inference from the record.

That the prosecutor's comments were not a reasonable inference from the record also magnifies their prejudicial impact. As the state court declared, they were "pure fiction." Although the evidence showed Zapata was involved in another incident in which OSP members used such epithets, there was no evidence to even suggest such comments were

made here. Additionally, the failure of either defense counsel or the court to question the prosecutor's repeated, albeit fictitious, version of the victim's last minutes would have led the jurors either to assume the statements were accurate or, at least, that the rank speculation was permissible. This case thus stands apart from others concluding that prosecutorial misconduct was not prejudicial. *See, e.g.*, *Darden*, 477 U.S. at 182 (noting the prosecutor's improper comment did not "manipulate or misstate the evidence").

### 4. The comments were not invited by defense counsel.

Under the doctrine of "invited response," "the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *United States v. Young*, 470 U.S. 1, 12 (1985). Here, nothing in defense counsel's closing argument invited the inflammatory remarks. *Cf. Darden*, 477 U.S. at 182 (noting that "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense"). This factor too counsels in favor of finding the remarks prejudicial.

### 5. No specific limiting instruction was given.

Finally, although the jury was generally instructed that "statements made by the attorneys during the trial are not evidence," the jury was never specifically instructed to disregard the inflammatory statements made in the prosecutor's rebuttal. By contrast, cases that have held prosecutorial misconduct nonprejudicial have pointed to the use of a specific limiting instruction. *See, e.g.*, *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974) (noting the

prosecutor's potentially improper remark was "followed by specific disapproving instructions"); *Cheney v. Washington*, 614 F.3d 987, 997 (9th Cir. 2010) (holding the state court reasonably determined the petitioner was not prejudiced by improper closing argument when "counsel brought the prosecutor's impropriety to the court's attention with only a slight delay").

Considering the weaknesses in the prosecution's case and the seriousness of the misconduct, we hold not only that prejudice was established on the record, but also that the California Court of Appeal unreasonably determined Zapata was not prejudiced by his counsel's failure to object to the prosecutor's egregious remarks.

## CONCLUSION

Defense counsel's failure to object to the prosecutor's inflammatory, fabricated and ethnically charged epithets, delivered in the moments before the jury was sent to deliberate Zapata's case, constituted ineffective assistance of counsel. The California Court of Appeal's failure to so conclude was based on unreasonable factual determinations and was an unreasonable application of controlling Supreme Court law. *See* 28 U.S.C. § 2254(d)(1)–(2). We thus **REVERSE** the judgment and **REMAND** the case with instructions to grant the petition for habeas corpus.